72 P.3d 1067 (2003)
149 Wash.2d 793
In the Matter of the DISCIPLINARY PROCEEDING AGAINST Jerry KAGELE, Attorney at Law.
No. 04851-7.
Supreme Court of Washington, En Banc.
Argued March 13, 2003.
Decided July 17, 2003.
*1069 Kurt M. Bulmer, Seattle, for Appellee/Respondent.
Kenneth Wendell Masters, Bainbridge Is., Joanne S. Abelson, Washington State Bar Assc, Seattle, for Petitioner/Appellant.
*1068 MADSEN, J.
Attorney Jerry Kagele appeals the Washington State Bar Association (WSBA) Disciplinary Board's (Board) recommendation that he be suspended from the practice of law for one year with reinstatement conditioned upon full payment of restitution to clients. The Board concluded that Kagele's refusal to return any portion of "fully earned and nonrefundable" retainer fees to clients upon his termination violated Rules of Professional Conduct (RPC) 1.5 and 1.15(d) and that Kagele violated various provisions of the RPCs by neglecting clients' matters, failing to communicate, failing to expedite litigation, failing to adhere to a client's wishes, and failing to act competently in filing a client's complaint. We find that Kagele has not violated RPC 1.5 and 1.15(d) but agree that violations relating to neglect and competency support a one year suspension.

FACTS
Jerry Kagele was admitted to the Washington State Bar on November 16, 1972. At the time of the alleged misconduct, he maintained a practice in Spokane, Washington. Kagele has had no prior disciplinary action.
In 1994, Kagele began offering his clients the option of paying for legal services at an hourly rate or on a flat fee basis. If the client elected to pay a flat fee and the case required more time than Kagele initially anticipated he accepted the additional work as his responsibility. Kagele sought guidance from the WSBA on how to structure his written fee agreements and received verbal guidance. The WSBA advised him to disclose in a written fee agreement that his fees were fully earned and nonrefundable. Kagele's fee agreements contained the following relevant language:
THE UNDERSIGNED Client retains Kagele Law Office, attorneys at law, for legal services regarding: _____ upon the following mutual covenants:
1) The fee is computed on an hourly rate of $ ______ with a minimum fee of $ ______. This fee is for professional services of the undersigned attorney.....
2) Receipt of $ ______ as a retainer is acknowledged. The retainer is considered fully-earned and nonrefundable. This retainer should be applied against the minimum fee for professional services....
Kagele filled in the blanks according to each individual case.
Kagele did not use a trust account in connection with fees received under these agreements. His clients either agreed to pay a fully earned, nonrefundable fee, which he would deposit into his office account, or in the limited number of cases where he agreed to work on an hourly basis, he did not take an advance fee requiring the use of a trust account. If Kagele's representation ended prior to the closure of a case, he would refund the fully earned, nonrefundable retainer if he felt that the client's termination was "justified," such as when clients had buyer's remorse, moved their residence, or changed their mind shortly after signing the agreement. Otherwise, he would not refund any amount of the retainer.

INDIVIDUAL GRIEVANCES

Gary and Mikell Sewell
Gary and Mikell Sewell hired Kagele on May 18, 1995 to bring an action against the contractor who built their home. The Sewell's signed the above fee agreement, specifically stating that Kagele's fee would be $5,000 "to ten days prior to trial." Ex. 1A. In May 1995, the Sewell's paid Kagele $5,000. On August 3, 1995, Kagele filed the complaint *1070 and summons but at that time did not inform the Sewells of the filing. Kagele named the contractor's bonding company in the lawsuit but did not properly serve the defendant and when informed of the improper service took no action to correct service.
In November 1995, the Sewells contacted Kagele about the status of the case, and Kagele informed them that the defendant hired a lawyer and had until November 15, 1995 to answer the complaint. The Sewells contacted Kagele on November 16 to determine the next step, and Kagele told them he would get back to them. He did not. After a May 1996 court date was set, the Sewells continued to contact Kagele every six weeks, but Kagele had no further information.
In the spring of 1996, Kagele contacted Chuck Moore to view the damage to the Sewell home. Mr. Moore viewed the home but did not write a report. Kagele also contacted a witness who was asked to be available for trial, as well as an architect but did not contact the witnesses that Mrs. Sewell provided. Kagele never viewed the home himself.
In July 1996, Kagele informed the clients that they would not go to trial in August and that November was a more realistic court date. Kagele filed a motion for default on July 23, 1996, and the defendant filed its answer on August 6, 1996. On August 15, 1996, Kagele filed a note for trial and certificate of readiness. Throughout this time, the Sewells would call Kagele to find out the status of their case, and Kagele would inform them that he had nothing to report. When the Sewells received a new trial date of November 20, 1996, Kagele did not inform them, and they learned of the date from the clerk's office.
On at least two occasions prior to October 29, the Sewells told Kagele that they wanted a jury trial. Kagele, however, never filed a jury demand and was preparing to go forward with a bench trial. On October 29, the Sewells asked Kagele why he had not filed the jury demand as they requested, and he informed them that they did not need a jury. On October 31, the Sewells wrote to Kagele, terminating his services and requesting the return of their file and the unearned portion of their retainer.
The Sewell's new lawyer inventoried the file and could not locate any discovery, notes of conversations or investigations, expert witness or consultation reports, research, or noted correspondence with the Sewells. Kagele explained that the lack of discovery and other trial preparation was a "strategic" approach. If this was his strategy it was never communicated to the Sewells. Kagele did not return any of the $5,000 retainer to the Sewells because he did not think that his termination was "justified," and he did not provide an accounting of his charges. Decision Papers (DP) at 6.

Lawrence and Hilde Turner
In September 1996, the Turners contacted Joe Schumaker to build a warehouse. Mr. Schumaker, however, failed to complete the warehouse on time, and produced poor workmanship and a leaking warehouse. Mr. Schumaker also charged more than the original quoted price. Town and Country Building Supply (T & C) supplied the lumber and filed a lien against the Turner home when Mr. Schumaker failed to pay the lumber bills. The Turners had already paid Mr. Schumaker for the lumber.
On April 7, 1997, the Turners contacted Kagele by telephone to discuss the matter. They thoroughly explained the situation, including the fact that T & C was very cooperative and willing to testify against Mr. Schumaker. The Turners met with Kagele later that same day for an hour and a half. This was their only meeting with Kagele. At the meeting, the Turners signed the "fully-earned and non-refundable" retainer fee agreement, stating that Kagele's fee was "a total minimum fee of $3,500" exclusive of costs. DP at 7. Kagele assured the Turners that he would take immediate action, and a summons and complaint would be served no later than the beginning of the following week, April 14, 1997. Kagele also promised to view the faulty construction but never did so.
At the meeting, Kagele requested that the Turners produce their complete file. The Turner's daughter mailed the file and a complete *1071 chronology of the facts to Kagele, and Kagele's office signed for the package on April 10, 1997. Between April 7 and May 22, 1997, the Turners did not hear from Kagele despite the messages they left for him. Kagele did try to get in touch with the Turners on May 15 but did not reach them until May 22. At this time, the Turners expressed their dissatisfaction with Kagele's performance. Approximately a week later, they received a draft summons and complaint from Kagele. The Turners noted that Kagele listed T & C as the defendant rather than Mr. Schumaker. They contacted Kagele to again express their dissatisfaction, and Kagele admitted that communication by him had been lacking. Kagele claimed that the omission of Schumaker from the complaint was a computer error, but he had not adequately read the chronology prepared by the Turners.
The Turners terminated Kagele's services on May 29, 1997 and requested the return of their file and the $3,500. Kagele responded with written excuses and sent another faulty draft of a complaint. The Turners sent a second termination letter. Kagele did not refund any of the retainer because he did not think that the termination was justified, and he did not provide a final accounting of his charges.

Salvador Camacho
On November 13, 1997, Mr. Camacho hired Kagele to assist him in an immigration matter. The previous day Mr. Camacho, a naturalized citizen, received a notice of revocation of naturalization from the Immigration and Naturalization Service which appeared to be an undated draft notice and was not served on Mr. Camacho. When Mr. Camacho hired Kagele he signed the "fully-earned, nonrefundable" retainer fee agreement, providing that he would pay Kagele a $3,500 retainer. On November 24, 1997, Mr. Camacho and Kagele met for an initial consultation, and Mr. Camacho signed a second fee agreement, which stated that he would pay $600 initially and at least $200 per month with the total due before the final hearing. Mr. Camacho paid Kagele $1,600 before he terminated Kagele's services.
On December 15, 1997, Kagele wrote a letter to the INS district director in Seattle, substituting himself for Mr. Camacho's previous lawyer, requesting a hearing in Spokane, explaining the case, and indicating that he would pursue the matter in federal district court if necessary. He included a notice of appearance (Form G-28) and also sent the notice to the executive office for immigration review/immigration court. Kagele received a letter dated December 17, 1997 from the Immigration Court returning his notice of appearance and indicating that the office did not have jurisdiction because the case had yet to be filed.
On May 15, 1998, Mr. Camacho terminated Kagele's services and requested a return of $1,400 of the retainer fee. Kagele refused to refund any of the retainer.

Brian and Michelle Shute
On March 11, 1998, the Shutes contacted Kagele to represent them in a dispute with their neighbors, the Coveys. The Coveys intended to build a garage at the end of a common driveway shared with the Shutes that would possibly block the Shutes' access to the alley. At the meeting, the Shutes provided Kagele with documents and photographs and specifically told Kagele that they wanted to review the complaint before it was filed and wanted him to return the documents when he was finished. Kagele told the Shutes that he would inspect the property that week. His inspection, however, amounted to driving by the home, and he did not look at the alley in the back of the home. The Shutes signed the "fully-earned, nonrefundable" retainer fee agreement, providing that they would pay $3,200. They paid $500 on March 11 and were to pay $1,000 per month with the balance due by June 1, 1998.
The next week, the Shutes called Kagele and were informed that the complaint had the "usual and typical stuff." DP at 14-15. Kagele, however, did not review the complaint in detail with the Shutes over the telephone. He then mailed a copy of the complaint to the Shutes rather than faxing the copy as they had requested. Furthermore, Kagele testified that he always sends his clients drafts of the summonses and complaints *1072 before they are filed, but he did not follow that practice with the Shutes. On March 23, 1998, he filed the summons and complaint in Shute v. Covey in Spokane County Superior Court. The complaint addressed the problem of the access to the Shutes' garage but made no mention of the problem of access to the alley beyond the garage. Additionally, the complaint contained incomplete and/or inaccurate legal descriptions, references to a 1919 easement rather than the more desirable prescriptive easement now in use, and an attempt to quiet title only to the center line of the one-car width driveway, which would prevent the Shutes from using the driveway.
On March 30, 1998, the Shutes terminated Kagele's services and requested that Kagele return their documents and photographs, as well as the $650 retainer minus any actual costs. That same day Kagele informed the Shutes that if they did not pay the remainder of the fee by June 1, 1998, regardless of whether they terminated his services, he would commence litigation to collect the remainder. On April 10, 1998, Michael D. Currin, the Shutes' new lawyer, sent Kagele a letter requesting that Kagele provide an itemized billing statement and the Shutes' original file. Mr. Currin stated that the Shutes were willing to pay Kagele a reasonable amount for his services. On April 13, 1998, Kagele received a warning of trespass from the Covey's lawyer but did not inform the Shutes of the warning.
On April 23, 1998, Kagele filed a small claims action against the Shutes. On April 27, 1998, Kagele filed a notice of attorney lien for $2,700 in Shute v. Covey, as well as a notice of withdrawal of attorney. In the meantime, Mr. Shute requested his file several times before he appeared at Kagele's office on May 8, 1998. Kagele subsequently mailed the file to the Shutes. On June 25, 1998, the small claims court awarded a judgment for Kagele for an additional $2,525 with 12 percent interest. The Shutes paid the judgment.

Bernie and Linda Van Diest
On January 17, 1995, the Van Diests hired Kagele to advise them in a dispute with Chicago Title Company against the Ness family. The Van Diests and Chicago Title had commenced a lawsuit against the Ness's, and the Van Diests were currently represented by an attorney, Mr. Cullen, who was being paid by Chicago Title. At the initial meeting, the Van Diests signed the "fully-earned, nonrefundable" retainer fee agreement, providing that they would pay Kagele $5,000, "payable $3000 on 1-17-95; balance of $2000 on 3/15/96." DP at 17. They paid Kagele $3,000 at this time.
Kagele entered a notice of appearance on January 25, 1995, in Van Diest and Chicago Title v. Ness and asked Mr. Cullen to withdraw. From that point on, the Van Diests only spoke with Kagele when they initiated contact with him, inquiring on the status of their case. In March 1995, the Van Diests met with Kagele, and he demanded that they pay the balance of the fee. The Van Diests did not want to pay the balance because they believed Kagele had not done any work for them at that point. On April 18, 1995, at the advice of another attorney, the Van Diests wrote Kagele a letter stating that they no longer needed his services.

Ruth Born
On January 10, 1996, Ms. Born and her father, Joe Noll, retained Kagele because Ms. Born loaned her daughter, Melissa, $13,000 for a down payment on a riding stable and did not receive a promissory note or any other writing to document the loan. Ms. Born asked Kagele to draft a promissory note and to review a Deed of Trust connected to a business loan taken by Melissa for the stables. The bank used collateral from both Ms. Born and Mr. Noll. At the initial meeting, they signed the "fully-earned, nonrefundable" retainer fee agreement, providing that Kagele's fee would be $750. Collectively they paid Kagele $750 at this time.
Ms. Born attempted to reach Kagele by telephone, leaving messages on February 9, 13, 19, 27, 29; March 11, 25; and April 3, 1996. Kagele only returned her February 29 phone call. Between January 1996 and April 1996, Mr. Noll also unsuccessfully tried to reach Kagele.
*1073 On April 15, 1996, Ms. Born wrote Kagele a letter terminating his services and requesting her file and an accounting of how Kagele spent the retainer money. Kagele returned the file that day but refused to refund any of the retainer. Kagele did not return any of the retainer fee because he did not think that his termination was "justified." DP at 21. Ms. Born received the original file, containing the documents she supplied to Kagele and a copy of a letter Kagele sent to Melissa on January 18, 1996. Melissa refused to sign a promissory note and became upset with the situation.

Stanley and Luz Angela Clavijo Banquero Matlock
Mr. Matlock hired Kagele on April 4, 1995 to assist his fiancée, Luz Angela Clavijo Banquero, with immigration issues. She entered the United States from Colombia on a B2 visitor's visa that she obtained by misrepresenting her marital status. Kagele agreed to represent Ms. Clavijo in all her INS problems for a total fee of $7,500. Mr. Matlock signed the "fully-earned, nonrefundable" retainer fee agreement at this time, providing for a $7,500 retainer, "payable $1500 down, $400 per month for six months with balance due by November 1, 1995." DP at 22. Mr. Matlock paid Kagele $1,500 but did not make any further payments thereafter.
On April 21, 1995, Mr. Matlock married Ms. Clavijo. A few months later, Mr. Matlock informed Kagele that he did not have any money and wanted the $1,500 returned. On December 20, 1995, Mr. Matlock again requested the return of the money, and Kagele refused. Mr. Matlock then wrote Kagele a letter on December 26, requesting an itemized statement showing how he used the $1,500. Kagele did not provide an itemized statement and testified that he was available if Ms. Clavijo was arrested by the INS. He did not return any of the retainer because he did not think that the termination was "justified." DP at 25.
Mr. Matlock commenced a small claims court action to recover the retainer. Kagele counterclaimed for the remaining $6,000 due on the retainer. Matlock, in turn, counter-claimed for hundreds of thousands of dollars in damages. Kagele prevailed and obtained a judgment of $6,000. The Court of Appeals granted interlocutory review, but Mr. Matlock abandoned the matter, filed bankruptcy, and obtained a discharge of Kagele's judgment.

Clara Hite
On June 6, 1996, Clara Hite hired Kagele to represent her in a dispute regarding a house she shared with her boyfriend, Mathew Winkler. Ms. Hite had advanced money for the house. Kagele told Ms. Hite that a complaint would have to be filed in order to prevent Mr. Winkler from selling the house. Ms. Hite signed the "fully-earned, nonrefundable" retainer fee agreement, providing for a $3,000 retainer fee. At this time, Ms. Hite offered to give Kagele copies of her documentation, and Kagele told her to get together the documents showing her investment in the house.
Ms. Hite initiated all of the contacts with Kagele and left messages for him on June 17; July 3, 24, 26; August 6, 12, 14, 16, 20; and September 5, 1996. Kagele did not return these calls. On July 11, Ms. Hite reached Kagele, and he informed her that the complaint would be served momentarily. On July 31, Kagele reported that he had not spoken to the process server to determine if the complaint had been served. He still had not spoken to the server on August 21.
On August 26, 1996, Ms. Hite sent Kagele a letter terminating his services and requesting the return of her money. Kagele received the letter on September 4 and called Ms. Hite at her father's home. Kagele did not reach Ms. Hite but spoke to her father. The next day, Kagele filed a complaint for damages and equitable relief on behalf of Ms. Hite. Also on this day, Ms. Hite sent Kagele a letter via facsimile, asking about the conversation with her father and the status of her case. On September 7, 1996, Mr. Winkler was served with the summons and complaint, and on or about September 10, Kagele received another letter via facsimile from Ms. Hite indicating that she no longer wanted Kagele to pursue the case. Kagele nonetheless filed a lis pendens on September 10. Kagele did not return any of the $3,000 *1074 retainer because he did not think that Ms. Hite's termination was "justified." DP at 28.

Michael McKinney
Mr. McKinney hired Kagele on October 17, 1995 for his help on an issue with a well-digging contractor. Mr. McKinney signed the "fully-earned, nonrefundable" retainer fee agreement, providing for a payment of $500. At the end of January 1996, Mr. McKinney received a copy of a letter of intent that Kagele sent to the contractor. Mr. McKinney also received a letter from Kagele dated January 23, relaying the contractor's reply. There was no evidence at Kagele's hearing as to whether Kagele was terminated by the McKinneys. By May 13, 1996, the McKinneys hired a different attorney who requested information from Kagele on the case.

Procedural History
On January 25, 2000, the WSBA filed a formal complaint against Kagele, followed by an amended formal complaint on June 12, 2000 and a second amended formal complaint on November 22, 2000. Ultimately, the WSBA charged Kagele with 7 counts of misconduct affecting 11 clients, subjecting him to discipline pursuant to former RLD 1.1(i) (1997). Specifically, the complaint contained the following allegations:
Count I: Kagele failed to diligently and promptly pursue matters for clients McKinney, Hite, Matlock/Clavijo, Hanley, Turner, Camacho, Born, Van Diest and Sewell in violation of RPC 1.3.
Count II: Kagele failed to properly communicate with clients Born, Hite, Turner, Van Diest and Sewell in violation of RPC 1.4.
Count III: Kagele failed to expedite litigation on behalf of clients Sewell, Born, Hite, Turner and Van Diest in violation of RPC 3.2.
Count IV: Kagele failed to abide by the Sewells' expressed wishes in violation of RPC 1.2.
Count V: Kagele charged an unreasonable fee and failed to refund unearned fees upon termination of his services to clients Van Diest, Matlock/Clavijo, McKinney, Born, Hite, Sewell, Hanley, Turner, Camacho, Walton and Shute in violation of RPC 1.5 and 1.15(d).[1]
Count VI: Kagele misrepresented information to clients McKinney and Sewell in violation of RPC 8.4(c).
Count VII: Kagele's filing of a complaint on behalf of the Shutes that contained numerous errors violated RPC 1.1 (competence).
Hearing Officer James M. Danielson presided over a five day hearing, lasting from April 23 through April 27, 2001. He heard from 16 witnesses, including 2 witnesses who testified to Kagele's good character, reviewed substantial exhibits and briefing, and heard arguments from counsel. On May 3, 2001, the hearing officer filed findings of fact, conclusions of law, and recommendation. Specifically, he found the following violations:
 Kagele violated RPC 1.3 in failing to diligently and promptly pursue matters entrusted to him for clients Sewell, Turner, and Matlock but dismissed the lack of diligence claims as to clients Camacho, Van Diest, Born, McKinney, and Hite.
 Kagele violated RPC 1.4 in failing to communicate to clients Sewell, Turner, Born, and Hite but dismissed the count as to client Van Diest.
 Kagele violated RPC 3.2 in failing to expedite litigation on behalf of clients Sewell, Turner, and Hite but dismissed the count as to clients Van Diest and Born.
*1075  Kagele violated RPC 1.2 in failing to abide by the Sewells' expressed wishes for a jury trial.
 Kagele violated RPC 1.1 (competency) by filing a complaint on behalf of the Shutes that contained numerous errors and by failing to review it with the clients prior to filing.
 Kagele violated RPC 1.5 (reasonable fees) and RPC 1.15(d) (refunding unearned attorney fees) by failing to refund any portion of fully earned, nonrefundable flat fees to clients Sewell, Turner, Camacho, Shute, Van Diest, Born, Matlock, McKinney, and Hite upon his termination.
 Count VI's allegations that Kagele made misrepresentations to clients McKinney and Sewell were fully dismissed.
Additionally, the hearing officer concluded that Kagele did not violate the ethical rules by using fully earned, nonrefundable retainer fee agreements for a specific case or project, as Washington law has not established that such retainers are unethical.
The hearing officer determined a reprimand to be the presumptive sanction for Kagele's negligence in drafting the Shutes' complaint, as well as for his failure to expedite litigation for three clients. ABA, STANDARDS FOR IMPOSING LAWYER SANCTIONS std. 4.53 (1991 & Supp.1992) (negligently determining if competent to handle matter) and std. 6.23 (negligently failing to comply with court order/rule) (hereinafter ABA Standards).
The hearing officer found that Kagele's multiple incidents of lack of diligence, failure to communicate, and failure to abide by a client's wishes established a pattern of neglect causing injury or potential injury to the clients but not serious or potentially serious injury. For these violations, the hearing officer determined the presumptive sanction to be suspension under ABA Standards std. 4.42(b) (pattern of neglect causing injury or potential injury).
As to Kagele's violations of charging an unreasonable fee, RPC 1.5, and failing to refund unearned fees, RPC 1.15(d), the hearing officer stated that it was a "close question" as to whether Kagele "knowingly" or "negligently" engaged in conduct that is "a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system." DP at 35. ABA Standards std. 7.2, commentary, provides suspension as the presumptive sanction "when the lawyer does not mislead a client but engages in a pattern of charging excessive or improper fees," and standard 7.3 provides a reprimand as the presumptive sanction where there is little or no injury to the client. In light of the aggravating and mitigating circumstances, the hearing officer determined suspension to be the appropriate sanction.
The six aggravating factors found to apply include: (1) pattern of misconduct, (2) multiple offenses, (3) refusal to acknowledge the wrongful nature of the conduct, (4) vulnerability of the victim, (5) substantial experience in the practice of law, and (6) indifference in making restitution. The hearing officer found the presence of four mitigating factors: (1) absence of a prior disciplinary record, (2) full and free disclosure to the disciplinary board or cooperative attitude toward proceedings, (3) character and reputation, and (4) delay in disciplinary proceeding. The hearing officer also concluded that Kagele's mental state was not impaired at any time.
The hearing officer ultimately recommended that Kagele be suspended from the practice of law for one year with the right to apply for reinstatement after six months, upon showing that restitution has been made to the clients for the unearned portion of their fees. Kagele and the WSBA filed cross-motions to amend, and on May 30, 2001, the hearing officer amended his recommendation and decreased the sanction to a six-month suspension, with reinstatement conditioned upon full payment of restitution.
Kagele appealed to the Board. On April 2, 2002, the Board reviewed Kagele's matter and in an 8-1 decision adopted the hearing officer's findings of fact and conclusions of law. The Board modified the hearing officer's recommendation by decreasing the amount of restitution as to two clients and increased the overall recommendation to a *1076 one-year suspension with reinstatement conditioned upon full payment of restitution. The dissent would have dismissed the case in its entirety, finding it "inappropriate to discipline a lawyer based on a new analysis of his fee agreement that has no precedent in Washington case law." DP at 57. Moreover, the dissent found the other conclusions of law unsupported by the evidence in the record.

ANALYSIS
The ultimate responsibility and authority for determining the nature of lawyer discipline rests with this court. In re Disciplinary Proceeding Against Tasker, 141 Wash.2d 557, 565, 9 P.3d 822 (2000). This court, however, has delegated certain responsibilities to the WSBA, and a hearing officer makes findings of fact, conclusions of law, and initial recommendations to the Board. In re Disciplinary Proceeding Against Heard, 136 Wash.2d 405, 413-14, 963 P.2d 818 (1998). "This court does not lightly depart from the Board's recommendation; however it is not bound by it." Tasker, 141 Wash.2d at 565, 9 P.3d 822.
This case presents the court with two central issues: (1) whether Kagele's refusal to return any portion of fully earned, nonrefundable retainer fees to clients upon his termination violates RPC 1.5 and 1.15(d) and (2) whether Kagele engaged in a pattern of neglect of clients' matters, negligently drafted the Shutes' complaint, and failed to expedite litigation in the Sewell, Turner, and Hite matters. Kagele argues that the Board wrongfully found that it was unethical to fail to return any portion of the retainer fees when he was terminated prior to the completion, of services. Moreover, he contends that the Board wrongfully entered findings of fact that were not supported by a clear preponderance of the evidence and accordingly, made erroneous conclusions that he violated various RPCs. Finally, he argues that the Board misapplied the ABA Standards, resulting in a recommendation for inappropriate sanctions and restitution.

Challenges of Findings of Facts
Kagele challenges 64 out of 181 of the hearing officer's findings of fact, which were adopted by the Board. We will uphold the hearing officer's findings of fact if they are supported by a clear preponderance of the evidence, even if the evidence is disputed. In re Disciplinary Proceeding Against Anschell, 141 Wash.2d 593, 606, 9 P.3d 193 (2000); In re Disciplinary Proceeding Against McMullen, 127 Wash.2d 150, 162, 896 P.2d 1281 (1995). Furthermore, we give considerable weight to the hearing officer's findings "particularly when the credibility and veracity of witnesses are at issue." In re McMullen, 127 Wash.2d at 162, 896 P.2d 1281; see also In re Disciplinary Proceedings Against Bonet, 144 Wash.2d 502, 512, 29 P.3d 1242 (2001) (credibility of witness is determination that properly resides in the hearing officer).
After reviewing the record, we are convinced that the evidence substantially supports the challenged findings of fact, except for the hearing officer's findings that Kagele completed a specific percentage of work for nine separate clients. DP at 7-30, Finding of Fact 33(FOF) ("Kagele performed only 10% of the work he was hired to do" for the Sewells), FOF 54 (10 percent for the Turners), FOF 73 (15 percent for Camacho), FOF 97 (5 percent for the Shutes), FOF 109 (30 percent for the Van Diests), FOF 128 (80 percent for Born), FOF 148 (5 percent for Matlock), FOF 171 (75 percent for Hite), and FOF 181 (80 percent for McKinney).
The record is silent on the method used by the hearing officer to calculate these percentages and contains no time analysis of Kagele's work for each client. The evidence does not establish what specific services Kagele agreed to render and lacks any assessment of the reasonable value of the services he did provide. While the record does contain client testimony regarding the purpose for which each client hired Kagele, as well as clients' perception of what Kagele did in each case, such evidence does not provide sufficient support for determining a percentage of work completed. No witnesses testified as to the time involved in researching or preparing each case. Moreover, Kagele and two of his clients, the Shutes and Mr. Matlock, apparently *1077 resolved disputes over the reasonableness of Kagele's fees in court. In both cases, the courts found Kagele's fee reasonable and fully earned and awarded judgments in his favor. By contrast, the hearing officer found that Kagele performed only five percent of the work he was hired to do for the Shutes and for Mr. Matlock. We hold that Findings of Fact 33, 54, 73, 97, 109, 128, 148, 171, and 181 are not supported by the record.
Kagele also challenges 55 other findings of fact but does so by arguing his version of the facts while ignoring testimony by other witnesses that supports each finding. Although we have independently reviewed the record, we give particular weight to the hearing officer's findings based upon a determination of credibility and veracity of witnesses, as he has direct contact with the witnesses and is in the best position to make such judgments. In re Bonet, 144 Wash.2d at 512, 29 P.3d 1242; In re McMullen, 127 Wash.2d at 162, 896 P.2d 1281. Considering the record and the hearing officer's findings, we uphold the findings of facts, except for those findings discussed above.

Challenges of Conclusions of Law
The court will uphold the hearing officer's conclusions of law if they are supported by the findings of fact. In re Disciplinary Proceeding Against Huddleston, 137 Wash.2d 560, 569, 974 P.2d 325 (1999).
We first address Kagele's challenges to the conclusions that he violated RPC 1.3 in failing to diligently and promptly pursue matters entrusted to him for clients Sewell, Turner, and Matlock; RPC 1.4 in failing to communicate to clients Sewell, Turner, Born, and Hite; RPC 3.2 in failing to expedite litigation on behalf of clients Sewell, Turner, and Hite; RPC 1.2 in failing to abide by the Sewell's expressed wishes for a jury trial; and RPC 1.1 in filing a complaint on behalf of the Shutes that contained numerous errors and failing to review the complaint with the Shutes prior to filing. As previously discussed, the factual findings support the conclusion that Kagele violated the various rules relating to lack of diligence, communication, expedition of litigation, competence, and failure to abide by client's wishes. Therefore, we uphold these conclusions.
Kagele next challenges the conclusions that he charged an unreasonable fee and failed to refund unearned fees to clients Sewell, Turner, Camacho, Shute, Van Diest, Born, Matlock, McKinney, and Hite. Pursuant to Kagele's written fee agreement, Kagele received a "fully-earned, nonrefundable" retainer from each of these clients. In essence, the agreements provided for the payment of an advanced flat fee that covered all of the services Kagele would provide on a specified legal problem or case, regardless of the actual time and amount of work he performed. The WSBA does not allege that Kagele violated the RPCs by using these retainer agreements; rather, it alleges that Kagele violated RPC 1.5 and 1.15(d) by charging unreasonable fees when he refused to refund unearned fees to clients upon his termination.
The Rules of Professional Conduct govern Kagele's conduct, and the WSBA has jurisdiction to determine the reasonableness of attorney fees by applying the enumerated factors found in RPC 1.5(a)(1-8). In re Disciplinary Proceeding Against Boelter, 139 Wash.2d 81, 96, 985 P.2d 328 (1999). The rules also require an attorney to refund "any advance payment of fee that has not been earned." RPC 1.15(d). In this case, however, the record does not support finding that Kagele's fees were unreasonable or that he failed to refund unearned fees to these clients. The record does not establish the actual services Kagele rendered in each case, nor does it contain an assessment of the reasonable value of the work Kagele performed. Since there are no findings of fact to support the hearing officer's conclusions that Kagele violated RPC 1.5 and 1.15(d), we cannot discipline Kagele for the fees charged and retained. Furthermore, we cannot uphold the Board's recommendation that Kagele pay restitution to the nine clients for unearned fees.[2]

*1078 Sanction
We must now determine the proper sanction for Kagele's violations of RPC 1.3, 1.4, 3.2, 1.2, and 1.1. The court gives great weight to the conclusions of the Board regarding the recommended sanction and will not lightly depart from its recommendations. In re Disciplinary Proceeding Against Haskell, 136 Wash.2d 300, 317, 962 P.2d 813 (1998). However, the court is not bound by the recommendations and retains ultimate authority for determining the appropriate sanction for an attorney's misconduct. Id.
In making sanction determinations, the court utilizes the ABA Standards as a basic, but not conclusive, guide. In re Anschell, 141 Wash.2d at 608, 9 P.3d 193. Under the Standards, the court engages in a two step process by first determining the presumptive sanction by considering (1) the ethical duty violated, (2) the lawyer's mental state, and (3) the extent of the actual or potential harm caused by the misconduct. Id. (citing In re Disciplinary Proceedings Against Johnson, 118 Wash.2d 693, 701, 826 P.2d 186 (1992)). The court then considers any aggravating or mitigating factors which may alter the presumptive sanction. Id.

Ethical Duties Violated
We uphold the Board's determination that Kagele violated the following ethical duties: three violations of RPC 1.3 (diligence); four violations of RPC 1.4 (communication); three violations of RPC 3.2 (expedite litigation); one violation of RPC 1.2 (representation); and one violation of RPC 1.1 (competence).

Mental State
Under the ABA Standards, "`[t]he lawyer's mental state may be one of intent, knowledge, or negligence.'" In re McMullen, 127 Wash.2d at 169, 896 P.2d 1281 (quoting ABA Standards std. 3.0 & cmt. at 25). A lawyer acts with intent when he or she has the "`conscious objective or purpose to accomplish a particular result.'" Id. He or she acts with knowledge when he or she has "`the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result,'" and in negligence "when he or she fails to `heed a substantial risk that circumstances exist or that a result will follow' and that failure `is a deviation from the standard of care that a reasonable lawyer would exercise in the situation.'" Id. (quoting ABA Standards Definitions at 7).
In relation to the lack of diligence/neglect violations, neither the hearing officer nor the Board entered separate conclusions as to Kagele's mental state. The presumptive sanctions that the Board found as appropriate for these violations, however, reflect Kagele's mental state as negligence. We agree that Kagele acted negligently in the handling of the clients' matters and consequently in violation of the ethical rules.

Extent of Harm
The hearing officer concluded that Kagele's failure to diligently and promptly pursue clients' matters, to communicate to clients, and to abide by the Sewells' expressed wishes together created a pattern of misconduct that caused injury or potential injury to the clients but not serious injury.
The hearing officer did not separately conclude the extent of harm caused by Kagele's failure to expedite litigation for three clients or the harm caused by his lack of competence in drafting the Shute's complaint. We find that Kagele's negligence in the aforementioned cases had the potential to cause injury to the clients including inconvenience, delay in resolving their cases, and the additional expense to retain new representation after terminating Kagele.

Presumptive Sanction
The hearing officer determined that the presumptive sanction for Kagele's three *1079 violations of diligence, four violations of communication, and one violation of failure to abide by a client's decision is suspension. Generally, suspension is appropriate when "a lawyer engages in a pattern of neglect and causes injury or potential injury to a client." ABA Standards std. 4.42(b). Kagele argues that the appropriate sanction for the various neglect violations is a reprimand or censure because each of the alleged acts of misconduct standing alone would deserve no more than a reprimand or censure. Kagele's acts of misconduct, however, do not stand alone and instead amount to eight different instances of his failure to act diligently and promptly to pursue matters for clients, establishing a pattern of neglect. Suspension is the appropriate presumptive sanction.
The hearing officer next determined that the presumptive sanction for Kagele's negligent drafting of the Shute's complaint is a reprimand. A reprimand generally is appropriate when a lawyer "is negligent in determining whether he or she is competent to handle a legal matter and causes injury or potential injury to a client." ABA Standards std. 4.53(b). We agree that a reprimand is the presumptive sanction for the RPC 1.1 violation.
Lastly, the hearing officer determined that the presumptive sanction for Kagele's failure to expedite litigation for three separate clients is a reprimand. Under ABA Standards std. 6.23, a reprimand is generally appropriate "when a lawyer negligently fails to comply with a court order or rule, and causes injury or potential injury to a client or other party, or causes interference or potential interference with a legal proceeding." Kagele argues for an admonition under ABA Standards std. 6.24. Admonition is appropriate where there is "an isolated instance of negligence in complying with a court order or rule." ABA Standards std. 6.24. Kagele failed to expedite litigation for three clients. This is not an isolated violation of RPC 3.2, and a reprimand is the appropriate presumptive sanction.

Aggravating and Mitigating Factors
The court next reviews the aggravating and mitigating factors that may justify departing from the presumptive sanctions. The hearing officer found six aggravating factors present: (1) pattern of misconduct, (2) multiple offenses, (3) refusal to acknowledge the wrongful nature of the conduct, (4) the vulnerability of the victim, (5) substantial experience in the practice of law, and (6) indifference in making restitution. The hearing officer also found four mitigating factors in this case: (1) absence of a prior disciplinary record, (2) full and free disclosure to disciplinary board or cooperative attitude toward these proceedings, (3) character and reputation, and (4) delay in disciplinary proceedings.
Although the findings of fact support the hearing officer's conclusions regarding four of the aggravating factors, we find that he erroneously determined that the vulnerability of the victims and Kagele's indifference in making restitution constitute aggravating factors. First, the record does not support that any clients' vulnerability rises to an aggravating factor. The WSBA contends that the clients were vulnerable because Ms. Born received disability payments and her father was elderly; Mr. Camacho and Mr. Matlock had serious problems with the INS; the Sewells, Turners, Shutes, and Ms. Hite were in pressure situations; and the Shutes had never hired an attorney before. The WSBA's argument is unfounded. People hire attorneys because they are in situations serious enough to require legal expertise and advice. A client's need for an attorney does not render him or her vulnerable and neither does hiring an attorney for the first time. Furthermore, the record here does not support finding that old age or financial status rendered any of the clients vulnerable.
Second, the fact that Kagele is indifferent to paying restitution to the nine clients is not an aggravating factor. The record does not support that Kagele retained unearned fees or that the fees he received in each case were not reasonable for the actual work he performed. Therefore, he cannot be penalized for his belief that he is under no obligation to return the fees. Nonetheless, we find a related aggravating factor. Kagele provided inadequate and unprofessional representation *1080 to clients and when terminated, the clients lost the entire retainer fee. Kagele, thus, placed clients in the untenable position of either continuing with his services and receiving sub-standard representation or terminating his services and forgoing the entire "fully-earned, nonrefundable" fee before the completion of legal services. Clients have an unfettered right to terminate an attorney's representation "either for good or fancied cause, or out of whim or caprice, or wantonly and without cause." Kimball v. Pub. Util. Dist. No. 1 of Douglas County, 64 Wash.2d 252, 257, 391 P.2d 205 (1964); see also Fetty v. Wenger, 110 Wash.App. 598, 600 n. 4, 36 P.3d 1123 (2001); 7 Am.Jur.2d Attorneys at Law § 282 (1997). Although harsh from the attorney's perspective, this rule is necessary for the protection of clients and the public in general. Kimball, 64 Wash.2d at 257, 391 P.2d 205. Kagele's conduct hindered the clients' right to terminate his representation and aggravates the circumstances of his misconduct.
We also disagree with the hearing officer's conclusion that delay in disciplinary proceedings serves as a mitigating factor in this case. Kagele fails to demonstrate that the delay was inexcusable or undue, nor does he explain why delay, if any, should be considered mitigating. We have found delay mitigating where the attorney rehabilitated over a lengthy period of delay, In re Tasker, 141 Wash.2d at 569, 9 P.3d 822, but there is no showing of rehabilitation here. Furthermore, the WSBA contends that Kagele's own delay before this court in seeking extensions of time to file his brief militates against the factor. We find nothing in the record to support a finding that unexplained or undue delay constitutes a mitigating factor in this case.
On the basis of the five aggravating factors and three mitigating factors, we conclude that the presumptive sanction of a one-year suspension for Kagele's pattern of neglect of clients' matters and a reprimand for his lack of competence and failure to expedite litigation should not be reduced.

Noble Factors
Lastly, we will depart from the Board's recommendation if we find that the sanction is inappropriate considering what have become known as the Noble factors. In re Disciplinary Proceeding Against Noble, 100 Wash.2d 88, 667 P.2d 608 (1983). In our recent decision, In re Disciplinary Proceeding Against Kuvara, 149 Wash.2d 237, 66 P.3d 1057 (2003), we held that only two of the five original Noble factors require separate discussion because the ABA Standards duplicate the other three. Accordingly, we consider proportionality and the extent of agreement among the Board.

Proportionality
The disciplined attorney has the burden to bring forward cases to persuade the court that the recommended sanction is disproportionate. Kagele has not presented the court with any cases to persuade us that the recommended sanctions of one-year suspension and reprimand are disproportionate to his misconduct.

Extent of Agreement
The weight given to the recommended sanction may vary depending on the extent of agreement among the Board. Here, the Board recommended Kagele's sanction by an 8-1 decision. The extent of the Board's agreement does not provide a reason to depart from the Board's recommended sanction.

CONCLUSION
Accordingly, we dismiss the Board's conclusion that Kagele violated RPC 1.5 and 1.15(d). We find that Kagele's pattern of neglect of clients' matters violates various provisions of the RPCs, and we order him suspended from the practice of law for one year. We also issue a reprimand for Kagele's violations of RPC 1.1 (competence) and 3.2 (failure to expedite litigation).
ALEXANDER, C.J., IRELAND, BRIDGE, CHAMBERS, OWENS, FAIRHURST, JJ., concur.
*1081 SANDERS, J. (dissenting).
This case arises out of Jerry Kagele's pattern of neglect and incompetence. Specifically, Kagele failed to communicate with clients, failed to pursue his cases diligently or promptly, and went against his clients' express wishes. Thus, we must determine the appropriate sanction for Kagele's violation of the following ethical duties: three violations of RPC 1.3 (diligence); four violations of RPC 1.4 (communication); three violations of RPC 3.2 (expedite litigation); one violation of RPC 1.2 (representation); and one violation of RPC 1.1 (competence). The majority imposes a one year suspension. I dissent, because the majority's reasoning is clouded by the shadow of an ethical violation not proved.
Kagele's fee agreement stated that "[t]he retainer is considered fully-earned and nonrefundable." Kagele's agreement provided that the payment of the advance flat fee would cover all legal services associated with a specified legal problem, regardless of the extent or kind of services actually provided. However, after certain clients signed the fee agreement and tendered advance payment, Kagele engaged in a pattern of neglect and incompetence.
This case is not about whether nonrefundable retainer fees in Washington should be prohibited as a matter of public policy. Indeed the Washington State Bar Association (WSBA) does not even argue that Kagele's fee agreement violates the RPCs. Rather it argues that Kagele violated the RPCs by charging unreasonable fees in light of his negligence. Thus, assuming a nonrefundable retainer may be reasonable at the time the agreement for services is executed, and those services are competently rendered as agreed, the WSBA argues that subsequent unethical actions of the attorney may cause a nonrefundable fee to become unreasonable.
But the majority does not address whether a nonrefundable fee can become unreasonable by subsequent unethical action of the attorney. Rather the majority holds "there are no findings of fact to support the hearing officer's conclusions [regarding nonrefundable fees and therefore], we cannot discipline Kagele for the fees charged and retained." Majority at 1078. Though the majority purports not to discipline Kagele based on his fee agreement, the sanction is not reduced accordingly.
The WSBA Disciplinary Board's (Board) recommendation that Kagele be suspended from the practice of law for one year is based on two violations warranting suspension. First the Board concluded that Kagele's refusal to return any portion of his nonrefundable fees warranted suspension. Clerk's Papers at 341, 345 (Findings of Fact & Conclusions of Law). Second, the Board concluded Kagele's neglect and incompetence warrants suspension. Id. at 343, 344. I agree with the majority that the second claimed violation, and only this second violation, should be sustained. Nonetheless, the majority imposes the identical sanction recommended by the Boarda one year suspension. I would impose only a six month suspension because Kagele's ethical violation was narrower than that which otherwise might merit a one year suspension.
"The AMERICAN BAR ASSOCIATION'S STANDARDS FOR IMPOSING LAWYER SANCTIONS (1991 ed. & Supp. Feb. 1992) (hereafter ABA STANDARDS) govern bar discipline cases in Washington." In re Disciplinary Proceeding Against Halverson, 140 Wash.2d 475, 492, 998 P.2d 833 (2000). The ABA Standards directs one to the presumptive sanction, in this case suspension. ABA STANDARDS std. 4.42(b), at 33 (suspension is appropriate when "a lawyer engages in a pattern of neglect and causes injury...."). Aggravating and mitigating factors are then applied to alter the nature or gravity of the otherwise presumed sanction. Halverson, 140 Wash.2d at 492-93, 998 P.2d 833; ABA STANDARDS stds. 9.1-9.3, at 49-50; std. 2.3 cmt. at 21 ("The specific period of time for the suspension should be determined after examining any aggravating or mitigating factors....").
The majority agrees with the Board's finding that Kagele engaged in (1) a pattern of misconduct, and (2) committed multiple offenses. Majority at 1079-1080. These are aggravating factors per the ABA Standards. However, the Board also found that Kagele violated RPC 1.5 and 1.15(d) regarding unreasonable *1082 fees, whereas the majority and I would dismiss these claimed violations. Accordingly, Kagele's sanction should be reduced, not maintained.
The majority then invents a new aggravating factor, stating that "Kagele's conduct hindered the clients' right to terminate his representation and aggravates the circumstances of his misconduct." Majority at 1080. I fail to see how the majority can maintain it is not disciplining Kagele for "the fees charged and retained," as it imposes this aggravating factor. Majority at 1078. This new factor assumes impropriety in the use of nonrefundable fee agreements. I posit that when a client agrees to a nonrefundable fee, nothing hinders that client from terminating representation. By contract the client might merely forfeit the fee paid, if so agreed in the fee agreement.
No WSBA ethics opinion clearly addresses nonrefundable retainer agreements and this court has never clarified how they may be used. What is clear, however, is that nonrefundable fee agreements are not illegal in Washington. In fact, WSBA Formal Opinion 186 condones their use:

Any fee paid to a lawyer that the client has agreed is not refundable and is earned upon receipt for handling the client's case shall not be deposited in the lawyer's trust account. Such a fee is a true retainer.
Wash. State Bar Ass'n, Formal Opinion 186: The Proper Handling of Advance Fee Deposits and Retainers (1990), at http:// www.wsba.org/lawyers/ethics/formalopinions/186.htm (last visited June 30, 2003) (emphasis added). Admittedly, Opinion 186 deals with the proper handling of advance fee deposits and general retainers. However, the language of the ethics opinion condones the use of all nonrefundable fees. Kagele's disciplinary proceeding is not the proper case to reevaluate the use of nonrefundable fees. Nonrefundable fees are not prohibited in Washington and therefore the use of nonrefundable fee agreements cannot be used as an aggravating factor.
Case law dictates that this court should not lightly depart from the Board's recommendation. In re Disciplinary Proceeding Against Haskell, 136 Wash.2d 300, 317, 962 P.2d 813 (1998). The majority purports to follow this maxim. Majority at 1070. However, the majority does in fact depart from the Board's recommendation because it imposes the same sanction recommended by the Board on less egregious behavior. In other lack of diligence cases with multiple instances of misconduct this court has imposed suspensions varying in lengths of two years to far shorter.[1]See, e.g.,
 In re Disciplinary Proceeding Against Anschell, 141 Wash.2d 593, 608, 619, 9 P.3d 193 (2000) (two year suspension for multiple violations, including three violations of RPC 1.3 (diligence); three violations of RPC 1.4(a)(b) (communication); one violation of RPC 1.5(a) (reasonable fee); one violation of RPC 1.15(d) (refunding unearned fees); and one violation of former RLD 2.8 (duty to cooperate with a bar disciplinary investigation));
 In re Disciplinary Proceedings Against Burtch, 112 Wash.2d 19, 22-26, 28, 770 P.2d 174 (1989) (45 day suspension for a pattern of misconduct involving: three violations of RPC 1.5(b) (failure to communicate fees); six violations of RPC 1.3 (lack of diligence); six violations of RPC 3.2 (failure to expedite litigation); two violations of RPC 1.4 (failure to keep client fully informed); two violations of RPC 1.15(d) (failure to return client documents and unearned fees); one violation of former RLD 13.3 (failure to file a timely trust account declaration); and one violation of former RLD 2.8 (failure to cooperate with disciplinary investigation). The sanction was reduced by the mitigating factor of the attorney's financial turmoil.);[2]
 In re Disciplinary Proceeding Against Kennedy, 97 Wash.2d 719, 720-21, 649 P.2d 110 (1982) (60 day suspension for multiple *1083 instances of neglect, including the failure to arrive in court when expected and the failure to notify client that summary judgment had been granted); and
 In re Disciplinary Proceeding Against Yates, 90 Wash.2d 767, 768-69, 771-72, 585 P.2d 1164 (1978) (one year suspension for neglect of several client matters, plus multiple instances of prior similar misconduct).
In Anschell and Yates this court imposed two year and one year suspensions respectively, but unlike the attorneys in those cases, Kagele has no prior instances of misconduct. For Kagele a one to two year suspension is excessive. A suspension, however, should be no less than six months. ABA STANDARDS std. 2.3 cmt. at 21 ("The amount of time for which a lawyer should be suspended, then, should generally be for a minimum of six months...."). Thus, as suspension is the presumptive sanction for Kagele's lack of diligence and neglect, and the accepted minimum term for a suspension is six months, and the aggravating and mitigating factors demand a lesser sanction than imposed by the Board, I posit Kagele should be sanctioned by a six month suspension.[3]
Therefore I dissent.
JOHNSON, J., concurs.
NOTES
[1] The WSBA has not brought a separate count alleging that Kagele's use of the fully earned, nonrefundable retainer fee agreements violates the RPCs. Nevertheless, the WSBA argues that the fee agreement's language is confusing and fails to make clear that no portion of the retainer fee will be returned even if the client terminates Kagele prior to completion of the services he was hired to render. As no formal complaint was filed in this case, we decline to decide whether use of these retainers constitutes an ethical violation. However, we urge attorneys to carefully and clearly construct fee agreements to adequately disclose the nature of the fee and the client's responsibility regarding payment.
[2] We note that legitimate fee disputes often arise between clients and their attorneys concerning the reasonableness of the fee and whether the attorney earned the fee. In the absence of misconduct, such fee disputes are properly resolved in civil proceedings under a theory of quantum meruit, where the court hears expert witnesses on both sides to determine, by a preponderance of the evidence, the services performed by the attorney and the reasonable value of the services. Kimball v. Pub. Util. Dist. No. 1 of Douglas County, 64 Wash.2d 252, 256, 391 P.2d 205 (1964); Fetty v. Wenger, 110 Wash.App. 598, 36 P.3d 1123 (2002).
[1] The majority states that Kagele failed to bring forward cases showing that the recommended sanction is disproportionate. Majority at 1079. Not so. See Br. of Pet'r at 99-102.
[2] The Burtch court sets forth these RPC violations as those of the hearing officer, and it is not clear whether the court altered the number and/or types of violations in imposing its sanction.
[3] I agree with the majority that in addition to suspension, we should impose a reprimand for violations of RPC 1.1 (competence) and RPC 3.2 (failure to expedite litigation).