PER CURIAM.
 

 We have for review a referee’s report recommending that Peter David Ticktin, a member of The Florida Bar, be found guilty of professional misconduct and ad
 
 *931
 
 monished. We have jurisdiction.
 
 See
 
 art. V, § 15, Fla. Const. We approve the referee’s findings of fact, his recommendations as to guilt, and his findings in aggravation and mitigation, with the exception of the finding in mitigation of imposition of other penalties or sanctions. However, we disapprove the recommended discipline of admonishment. Instead, we impose a ninety-one-day suspension.
 

 BACKGROUND
 

 The Bar filed a two-count complaint against Ticktin seeking lawyer discipline. The Bar alleged that Ticktin violated a number of former Rules Regulating the Florida Bar, as they existed in 2002, through his representations and business dealings that constituted conflicts of interests. In addition, the Bar alleged that Ticktin breached lawyer-client confidentiality. A referee was appointed. The referee conducted a disciplinary hearing and subsequently submitted a report recommending that Ticktin be found guilty of violating the following four rules in Count I: rules 4-1.7(a) (Representing Adverse Interests); 4-1.7(b) (Duty to Avoid Limitation on Independent Professional Judgment); 4-1.7(c) (Explanation to Clients); and 4-1.8(a) (Business Transactions With or Acquiring Interest Adverse to Client). The referee also recommends that Ticktin be found not guilty of violating the following two rules as alleged in Count II: rules 4-1.6(a) (Consent Required to Reveal Information); and 4-1.8(b) (Using Information to Disadvantage of Client). The referee recommends that Ticktin be admonished and that costs be awarded to the Bar.
 

 The Bar petitioned for review challenging the referee’s recommendations of not guilty as to Count II and the recommended sanction of admonishment. Tick-tin cross-petitioned challenging the referee’s recommendation of guilt regarding Count I. The referee’s findings of fact and recommendations as to guilt, which we find are supported by the record, are as follows.
 

 COUNT I
 

 Beginning in 2001, and at all pertinent times afterward, Ticktin represented Paul Johnson in connection with various personal and business matters. Ticktin’s legal representation of Johnson included numerous matters related to three corporations for which Johnson was the founder, held executive authority over until January 2002, and had a continuing ownership interest: (1) Link Express Delivery Solutions, Inc. (LEDS); (2) Silver State Vending Corporation (Silver State) d/b/a Pony Express; and (3) Link Worldwide Logistics (LWL).
 
 [1]
 
 Johnson and Richard Bee were the only directors of LWL when it acquired a majority of the shares of stock of Silver State. But, Johnson made all the decisions for both LWL and Silver State, and was Bee’s boss.
 

 In the fall of 2001, the Securities and Exchange Commission (SEC) brought a civil action against Johnson concerning LEDS. Ticktin represented Johnson in connection with the civil action until he withdrew in April 2002.
 
 [2]
 
 Sometime before January 5, 2002, Johnson learned that criminal charges in connection with LEDS were going to be filed against him. Tick-
 
 *932
 
 tin dealt with the Assistant U.S. Attorney on Johnson’s behalf concerning the imminent criminal charges and advised Johnson concerning his grand jury appearance. Ticktin recommended a criminal attorney to Johnson, but he did not appear in the criminal case. Johnson was ultimately arrested and convicted of defrauding investors out of $20 million.
 

 In anticipation of his arrest, on or about January 5, 2002, Johnson met with Ticktin to discuss who would replace Johnson as chief executive officer (CEO) of Silver State. The referee believed Ticktin’s testimony that he was tricked by Johnson into suggesting himself as a suitable replacement. But both Ticktin and the law partner with whom Ticktin discussed the matter viewed it as an opportunity. On January 7, 2002, Johnson, Ticktin, Bee, and Ticktin’s law partner met at Ticktin’s law office where the following announcements was made concerning Silver State: (1) Ticktin would immediately replace Johnson as Chairman and CEO; (2) Tick-tin’s law partner would assume the role of chief financial officer (CFO); and (3) Tick-tin’s law firm would remain as corporate counsel. Bee understood that, after that meeting, Ticktin would be his new boss at Silver State.
 

 Ticktin failed to prepare a written document for Johnson or Silver State fully disclosing and transmitting the terms of the transaction or the terms by which Ticktin acquired an interest in Silver State, as required by former rule 4-1.8(a)(1).
 
 [3]
 
 The referee found that a written press release purportedly prepared and issued by Johnson did not satisfy the requirements of the rule. The press release stated that Ticktin accepted the position of Chairman and CEO, Ticktin’s law partner accepted appointment as CFO, and Johnson was to remain as a primary consultant. The press release was not prepared by Ticktin and did not fully disclose the terms of the transaction or contain the oral waiver of conflict and confidentiality Ticktin claims he obtained from Johnson, which the referee found was an essential term of the transaction.
 

 Ticktin testified that the oral waiver of conflict and confidentiality obtained from Johnson at the January meeting only pertained to Silver State. Ticktin admitted that he did not have a waiver from Johnson pertaining to LWL or a waiver from Silver State, pertaining to Johnson, as required by former rule 4-1.7(a). There is no evidence to show that Johnson understood the meaning or extent of any oral waiver claimed by Ticktin. In April 2002, when Ticktin presented a written waiver, Johnson refused to sign it.
 

 The referee found Ticktin’s testimony was not credible that he had not taken over as CEO of Silver State in January 2002. On February 26, 2002, Ticktin mailed a letter to shareholders and potential investors that stated he had assumed his role as CEO and Chairman of Silver State approximately eight weeks earlier. The referee found that when Ticktin made it known that he had no intention of being “Johnson’s ‘puppet,’ ” his interests became adverse to Johnson’s interests. The adverse positions between Ticktin and Johnson “became stark” by April 2002, when Ticktin decided he needed Johnson completely out of the business if it was to succeed.
 

 At that time, Johnson held an assignment for 14.5 million shares of LWL stock, which made him the majority shareholder.
 
 *933
 
 Furthermore, LWL was the majority shareholder in Silver State. Bee was the only active trustee for LWL after Johnson’s arrest. Bee testified that prior to Johnson’s ai’rest, the certificates for 14.5 million shares in LWL had been issued, but they had not been delivered to Johnson. Ticktin and Bee saw Johnson’s failure to take delivery of the shares in LWL as their mutual opportunity to completely oust Johnson from that corporation. Tick-tin visited Johnson in jail on multiple occasions during April 2002 in order to obtain Johnson’s signature on certain agreements. An initial proposed agreement would have provided Johnson with 2.5 million shares of Silver State stock in exchange for his 14.5 million shares in LWL. And that agreement also would have secured Johnson’s written waiver as to any existing conflicts of interest that Ticktin wanted and needed. Johnson refused to sign the agreement.
 

 In that same period, Bee approached Ticktin for advice regarding what to do about Johnson’s stock shares in LWL. Ticktin informed Bee that such advice would be a conflict of interest because he had no waiver of conflict from Johnson concerning LWL. Ticktin suggested that Bee seek the advice of other counsel regarding Johnson’s LWTL shares. After consulting with another lawyei', Bee informed Ticktin that he was advised that Johnson’s LWL shares could be cancelled. And Bee testified that even though it was his decision to cancel Johnson’s LWL shares, prior to doing so he discussed it with Ticktin. Ticktin told Bee to do whatever Bee thought was necessary. Bee cancelled Johnson’s LWL shares.
 

 After Bee cancelled Johnson’s LWL shares, Ticktin’s law firm prepared a letter, which Bee signed. That letter provided Johnson with another opportunity to sign a written waiver of conflict and another agreement prepared by Ticktin that offered Johnson 1.7 million shares Silver State stock. Again, Johnson refused to sign the agreement or the written waiver of conflict.
 

 The referee found that Ticktin was involved in conflicts of interest when he simultaneously represented LWL, Silver State, and Johnson. Ticktin admitted that he did not have the consent of LWL, Silver State, or Johnson for matters related to LWL. The referee found there was evidence clearly showing that Silver State and LWL were inextricably linked. Tick-tin was Bee’s boss at Silver State, Bee had assumed executive authority at LWL, and Ticktin’s law firm provided legal counsel to Bee on issues pertaining to LWL. Ticktin had access to confidential information for all of the parties involved and owed each party a duty of loyalty and confidentiality. The referee found that Ticktin was clearly working with Bee against Johnson’s interests when Ticktin was Johnson’s lawyer. Ticktin was representing the interests of Johnson and LWL contemporaneously with his efforts and the efforts of his law firm to resolve potential claims that were being made against Silver State and LWL by former LEDS shareholders. In taking steps to resolve those claims, Ticktin’s actions were in conflict with Johnson’s ownership interest in LWL.
 

 The referee further found that Ticktin’s self-interest and the interests of Silver State substantially limited his independent judgment in representing LWL and Johnson, contrary to the requirements of former rule 4-1.7(b). As Johnson’s attorney, Ticktin had a duty to seek all appropriate legal means to protect Johnson’s interests. Ticktin did not provide Johnson with the requisite counsel regarding his interest in LWL. Instead, Ticktin tried to get Johnson to sign the agreement to relinquish his shares, and when that failed, he did noth
 
 *934
 
 ing to prevent Bee’s actions to extinguish Johnson’s ownership interest in LWL, which necessarily worked to extinguish Johnson’s involvement in Silver State. Thus, the referee concluded that Ticktin could not reasonably believe that his representation of Johnson was not adversely affected by the actions in which he and his law firm participated. In addition, Ticktin did not perform the requisite consultation and obtain the necessary consents from his clients when he represented multiple parties in the action to extinguish Johnson’s ownership interest in LWL and Silver State, as required by rule 4-1.7(c).
 

 Based on these findings, the referee recommends that Ticktin should be found guilty of violating the following rules in Count I: rule 4-1.7(a) (a lawyer shall not represent a client if the representation of that client will be directly adverse to the interests of another client); rule 4 — 1.7(b) (a lawyer shall not represent a client if the lawyer’s exercise of independent professional judgment in the representation of that client may be materially limited by the lawyer’s responsibilities to another client or to a third person or by the lawyer’s own interest); rule 4-1.7(c) (when representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved); and rule 4-1.8(a) (a lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possesso-ry, security, or other pecuniary interest adverse to a client, except a lien granted by law to secure a lawyer’s fee or expenses, without written consent).
 

 COUNT II
 

 After Johnson was arrested on federal charges, Ticktin testified, in early March 2002, before a federal magistrate judge at a bond hearing. At that hearing Ticktin testified that, among other things, he did not believe Johnson was a flight risk. His opinion was based on the fact that Johnson had returned to Florida knowing that he was going to be arrested. However, in April 2002, Johnson told Ticktin that he learned that if convicted, he would not be placed in a minimum security facility, but a medium or maximum security prison. Ticktin testified before the referee that he could see fear in Johnson’s eyes and, thus, his opinion changed about whether Johnson was a flight risk. Because Ticktin learned that a federal district court judge was going to review the materials from the bail hearing the next day, Ticktin sent a letter to the Assistant U.S. Attorney, withdrawing his testimony before the federal magistrate judge. Ticktin’s letter indicated that he believed his testimony at the time it was given, but later had reason to change his mind.
 

 The referee found that Ticktin neither revealed any of his communications with Johnson nor indicated which portion of his previous testimony he no longer believed. The referee concluded that because Ticktin changed his opinion, had he not withdrawn his testimony, he would have violated rule 4-3.3(a)(4), providing that if a lawyer “has offered material evidence and thereafter comes to know of its falsity, the lawyer shall take reasonable remedial measures.” The referee reasoned that because rule 4-1.6(c)(5) provided that an attorney “may reveal such information to the extent the lawyer reasonably believes necessary ... to comply with the Rules of Professional Conduct,” Ticktin took the appropriate steps, under the rules governing professional conduct, to withdraw his testimony.
 

 Based on these findings, the referee recommends that Ticktin be found not guilty of the two rule violations charged in Count II: rule 4-1.6(a) (a lawyer shall not reveal
 
 *935
 
 information relating to representation of a client); and rule 4-1.8(b) (a lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client consents after consultation).
 

 SANCTION
 

 The referee found one aggravating factor, substantial experience in the practice of law. He also found six mitigating factors: (1) absence of a prior disciplinary record; (2) absence of dishonest motive; (3) full and free disclosure to the disciplinary board or a cooperative attitude toward its proceedings; (4) good character and reputation; (5) imposition of other penalties or sanctions;
 
 [4]
 
 and (6) remorse.
 
 [5]
 
 Based on his findings and Florida Standard for Imposing Lawyer Sanctions 4.34,
 
 [6]
 
 the referee recommends that the Court discipline Ticktin by admonishment.
 

 DISCUSSION
 

 Based on the parties’ challenges, we address five issues here: (1) whether the referee’s findings of fact are sufficient to support the recommendations of guilt as to Count I; (2) whether the referee’s findings of fact are sufficient to support the recommendations that respondent is not guilty as to Count II; (3) whether the referee’s decision not to find additional aggravating factors is clearly erroneous or without support in the record; (4) whether the referee’s findings in mitigation are clearly erroneous or without support in the record; and (5) whether the referee’s recommended sanction is reasonably supported by the Florida Standards for Imposing Lawyer Sanctions and existing case law.
 

 ANALYSIS
 

 First, we find no merit to Tick-tin’s challenge to the referee’s recommendations of guilt as to Count I. A referee’s factual findings must be sufficient under the applicable rules to support the recommendations as to guilt.
 
 See Fla. Bar v. Shoureas,
 
 913 So.2d 554, 557-58 (Fla.2005). Ticktin does not expressly challenge the referee’s extensive findings of fact or argue that those findings do not support the recommendations of guilt. Rather, regarding the rule 4-1.7 violations, Ticktin argues that he owed a duty to LWL not to help Johnson as well as a duty to Johnson not to help LWL. Ticktin maintains he did the only thing he could do under the circumstances and, thus, he contends that he backed away from any conflict as soon as it arose. Ticktin further offers undeveloped arguments that the referee made numerous errors regarding his recommendation of guilt as to the charges of violating rule 4-1.7. We find no merit in Ticktin’s argument. The referee’s findings of fact and this record support the conclusion that Ticktin immersed himself in a conflict-laden situation and acted in clear violation of rules 4 — 1.7(a)—(c).
 
 [7]
 

 
 *936
 
 Regarding rule 4 — 1.8(a),
 
 [8]
 
 Ticktin argues that the writing requirement of the rule should not be strictly interpreted to require that the writing be prepared by the attorney and urges us to find that the press release prepared by Johnson was sufficient in this case. We agree with the Bar that rule 4-1.8(a) contemplates that the attorney will prepare the written document disclosing the terms of the transaction by requiring that the terms must be “fully disclosed and transmitted in writing to the client in a manner that can be reasonably understood by the client.” The Bar also is correct that even if the writing could be prepared by the client, the referee found that the press release prepared by Johnson did not “fully disclose the terms of the transaction,” i.e., it did not state that Johnson was waiving any conflict of interest. These findings are sufficient to support the recommendation that Ticktin be found guilty of violating rule 4-1.8(a). We therefore approve the referee’s recommendation that Ticktin be found guilty of the rule violations alleged in Count I.
 

 Next, we examine whether the referee’s findings of fact are sufficient to support his recommendation that Ticktin be found not guilty of the rule violations alleged in Count II.
 
 See Shoureas,
 
 913 So.2d at 557-58. The Bar urges us to disapprove this recommendation.
 

 The Bar argues that when Ticktin withdrew the testimony that he gave before the federal magistrate judge, he revealed confidential information related to Johnson’s “innocuous statement” pertaining to his eventual prison placement if convicted. The referee found that Ticktin did not reveal any details about his conversation with Johnson or why his opinion had changed to the Assistant U.S. Attorney. Accordingly, the findings are sufficient to support a recommendation that Ticktin was not guilty of violating former rule 4-1.6(a) (Consent Required to Reveal Information).
 
 [9]
 
 The Bar further argues that Ticktin used the “information” he learned
 
 *937
 
 from his conversation with Johnson to Johnson’s disadvantage regarding a potential pretrial bond in 2002. The referee found that Ticktin
 
 did not
 
 use information acquired during his representation of Johnson in a way that disadvantaged Johnson’s chance to obtain a pretrial bond, even though Ticktin clearly changed his mind about whether Johnson was a flight risk. Thus, the referee’s findings support his recommendation of not guilty for any violations of former 4 — 1.8(b) (Using Information to Disadvantage of Client).
 
 [10]
 
 We therefore approve the referee’s recommendation that Ticktin be found not guilty of the rule violations alleged in Count II.
 

 Next, the Bar maintains that the referee should have found the aggravating factors of selfish motive, multiple offenses, a pattern of misconduct, and vulnerability of the victim. A referee’s findings in aggravation carry a presumption of correctness that should be upheld unless clearly erroneous or without support in the record.
 
 See Fla. Bar v. Arcia,
 
 848 So.2d 296, 299 (Fla.2003);
 
 see also Fla. Bar v. Morse,
 
 784 So.2d 414, 415-16 (Fla.2001);
 
 Fla. Bar v. Bustamante,
 
 662 So.2d 687, 687 (Fla.1995);
 
 Fla. Bar v. Hecker,
 
 475 So.2d 1240, 1242 (Fla.1985).
 

 We disagree with the Bar’s argument. Merely because there is some evidence pertaining to an aggravating factor does not mean that that evidence rises to the level necessary to support a finding of that aggravator. In weighing the evidence, the referee determined that only one aggravating factor, Ticktin’s substantial experience in the practice of law, applied.
 

 As to selfish motive, even though the referee found that there was an element of self-interest, he concluded that the finding was not sufficient to find this ag-gravator. The record supports the referee’s conclusion that Ticktin’s actions pertaining to the cancellation of Johnson’s LWL shares primarily benefitted the investors that Johnson defrauded. Therefore, the referee’s decision not to find selfish motive as an aggravating factor is not clearly erroneous.
 

 As to multiple offenses, Ticktin violated four rules within a single count in the complaint. Further, he is not guilty of the Count II violations.
 
 [11]
 
 Thus, it is not clear error that the referee decided not to find multiple offenses as an aggravating factor.
 

 As to a pattern of misconduct, the referee found Ticktin’s misconduct here to be aberrational. His misconduct relates to a single, continuing series of closely related events over a short period of time.
 
 [12]
 
 The referee’s decision that a pattern of misconduct should not apply as an aggravating factor is not clearly erroneous.
 

 
 *938
 
 Finally, in rejecting vulnerability of the victim as an aggravating factor, the referee found that Johnson was a “very sophisticated client who was the CEO of publicly traded corporations” who received a twenty-year sentence in a federal prison for defrauding investors of $20 million. Vulnerability of a victim is established when findings support that a respondent exercised undue advantage over a client who was not reasonably in a position to protect himself or herself.
 
 [13]
 
 The Bar argues that Johnson was a vulnerable victim of Ticktin merely because he was incarcerated during the pertinent period. In rejecting this aggravator, the referee properly considered the totality of the circumstances. The fact that Johnson was incarcerated does not require a finding of vulnerability of the victim. Accordingly, we approve the referee’s finding of a single aggravating factor.
 

 The Bar also challenges the following findings in mitigation: absence of a dishonest motive; full and free disclosure to the disciplinary board or cooperative attitude toward the disciplinary process; remorse; and imposition of other penalties or sanctions. “A referee’s findings as to mitigation ... carry a presumption of correctness and will not be disturbed unless clearly erroneous or without support in the record.”
 
 Fla. Bar v. Valentine-Miller,
 
 974 So.2d 333, 336 (Fla.2008);
 
 see also Arcia,
 
 848 So.2d at 299 (Fla.2003);
 
 Morse,
 
 784 So.2d at 415-16 (Fla.2001).
 

 The referee’s evaluation of the credibility of several witnesses, documen-taiy evidence, and the Bar’s concession before the referee that Ticktin had “no dishonest intent” supports the finding of absence of a dishonest motive as a mitigating factor. Next, without argument or other support, the Bar asserts that full and free disclosure to the disciplinary board or cooperative attitude toward the disciplinary process should not be found in mitigation. Because the Bar fails to show how this finding in mitigation is clearly erroneous or lacking in evidentiary support, we approve this mitigating factor.
 

 Next, the fact that the referee assigned little weight to the finding of remorse as a mitigating factor does not warrant its exclusion as a presumptively correct finding. The referee found that Ticktin was remorseful about not memorializing his business agreement and alleged waiver of conflict of interests in writing. Therefore, this finding in mitigation by the referee is also approved. However, the referee’s finding of imposition of other penalties or sanction as a mitigating factor, based on the fact that Ticktin (1) continues to fulfill his financial obligations even though he was forced to declare bankruptcy after he lost millions of dollars from his personal wealth, and (2) has experienced profound personal and professional embarrassment from being involved in the present disciplinary process,
 
 [14]
 
 is clearly erroneous. We have consistently determined that application of this mitigating factor
 
 *939
 
 requires the imposition of a formal sanction or penalty.
 
 [15]
 

 The referee does not provide any case law in support of his conclusion that the personal economic losses that Tiektin suffered should be considered the imposition of other penalties or sanctions under standard 9.32(k). While it is evident that the referee found Ticktin’s eventual financial circumstances and embarrassment to be sympathetic factors in this case, there is no authority for a finding of imposition of other penalties or sanctions as mitigation. Under the circumstances of this case, we see no reason to recognize Ticktin’s substantial personal economic losses and his embarrassment, all of which resulted from Ticktin’s serious professional misconduct, as other mitigating factors not enumerated in the standards. Accordingly, we disapprove the referee’s finding of imposition of other penalties or sanctions as clearly erroneous.
 

 Finally, we consider the referee’s recommended sanction. In reviewing a referee’s recommended discipline, this Court’s scope of review is broader than that afforded to the referee’s findings of fact because, ultimately, it is the Court’s responsibility to order the appropriate sanction.
 
 See Fla. Bar v. Anderson,
 
 538 So.2d 852, 854 (Fla.1989);
 
 see also
 
 art. V, § 15, Fla. Const. However, generally speaking, this Court will not second-guess the referee’s recommended discipline as long as it has a reasonable basis in existing case law and the Florida Standards for Imposing Lawyer Sanctions.
 
 See Fla. Bar v. Temmer,
 
 753 So.2d 555, 558 (Fla.1999).
 

 Before the referee, the Bar sought a sixty-day suspension. Finding a suspension too harsh, the referee recommends an admonishment, pursuant to standard 4.34.
 
 [16]
 
 The Bar challenges this recommendation urging us to impose at least a sixty-day suspension. We agree with the Bar that a suspension is warranted. An admonishment is not supported by the case law and the standards. Rule Regulating the Florida Bar 3 — 5.1(b) states that minor misconduct is the only type of misconduct for which an admonishment is appropriate. The rule states, in pertinent part, that a lawyer’s misconduct shall not be regarded as minor misconduct if “the misconduct resulted in or is likely to result in actual prejudice (loss of money, legal rights, or valuable property rights) to a client or other person.” R. Regulating Fla. Bar 3-5.1(b)(1)(B). Ticktin’s misconduct caused actual prejudice to Johnson.
 

 Johnson had a protectable interest in his LWL stock shares when Tiektin stood by while Bee cancelled the stock certificates, which Tiektin perceived would benefit Silver State. Tiektin later accepted and supported the cancellation. Tiektin failed to take appropriate legal steps to protect Johnson’s ownership interests in LWL. Ticktin’s misconduct either caused or led to Johnson’s loss of valuable property ownership interests in LWL. Thus, Ticktin’s
 
 *940
 
 misconduct was not minor pursuant to rule 3 — 5.1(b). The Bar relies on standard 4.32, which provides that “[sjuspension is appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.” Ticktin was cognizant that his representations constituted conflicts of interest, but did little or nothing to eliminate them. He did not adequately disclose the possible effect of the existing conflicts of interest to his clients. Regarding client injury, Ticktin caused injury or potential injury to Johnson when he did nothing to stop the cancellation of Johnson’s LWL stock certificates, which Ticktin perceived would benefit Silver State.
 
 [17]
 
 The actual injury (or potential injury) Ticktin caused is that he, as Johnson’s lawyer, actively worked against Johnson’s ownership interests, even while Johnson was in jail and remained his client.
 

 We find that Ticktin’s misdeeds are egregious and constitute serious violations of the rules governing every Florida lawyer’s professional conduct. Ticktin’s misconduct warrants a ninety-one-day suspension. A rehabilitative suspension is consistent with the discipline this Court has imposed for similar misconduct. In
 
 Florida Bar v. Sofo,
 
 673 So.2d 1 (Fla.1996), the respondent represented two corporations, in which he owned stock, with conflicting interests regarding a contract between those corporations without consent. The respondent used information that he obtained during the course of representing one corporation to its detriment and to the other corporation’s benefit. The Court imposed a ninety-one-day suspension.
 

 Ticktin’s blatant disregard for the rules governing conflicts of interest reflects his poor professional judgment. Ticktin’s misconduct is unbecoming of a member of The Florida Bar, and such misconduct will not be taken lightly by this Court. Therefore, we impose a ninety-one-day suspension to emphasize to the Bar and the public that misconduct like Ticktin’s will result in severe disciplinary consequences.
 

 Accordingly, Peter David Ticktin is hereby suspended from the practice of law for ninety-one days. The suspension will be effective thirty days from the filing of this opinion so that Ticktin can close out his practice and protect the interests of existing clients. If Ticktin notifies this Court in writing that he is no longer practicing and does not need the thirty days to protect existing clients, this Court will enter an order making the suspension effective immediately. Ticktin shall accept no new business from the date this opinion is filed until he is reinstated. Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Peter David Ticktin in the amount of $5,346.42, for which sum let execution issue.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, and LABARGA, JJ., concur.
 

 PERRY, J., did not participate.
 

 [1]
 

 . The referee reports that at the time Ticktin became Johnson's corporate lawyer, LEDS had already been dissolved, but Ticktin represented Johnson in litigation matters related to LEDS. Only after LEDS dissolved did Johnson launch Link Worldwide Logistics (LWL).
 

 [2]
 

 . It was not until April 24, 2002, that the federal trial court granted Ticktin leave to withdraw as counsel of record in the civil action.
 

 [3]
 

 . Ticktin personally invested millions of dollars into the business, giving him another basis for self-interest.
 

 [4]
 

 . The referee recommends this mitigation based on the fact that Ticktin lost millions of dollars and was forced into bankruptcy, yet he has continually met his financial obligations. Also the referee considered the personal and professional embarrassment Ticktin endured afterward to be a mitigating factor.
 

 [5]
 

 . The referee assigned little weight to this mitigating factor, because “[Ticktin] regrets only his failure to properly put the terms of his arrangement with Mr. Johnson in writing.”
 

 [6]
 

 . Standard 4.34 describes the circumstances under which admonishment is the presumptively appropriate discipline for an attorney’s failure to avoid a conflict of interest.
 

 [7]
 

 . Rule 4-1.7(a) (Representing Adverse Interests) (2002) provided:
 

 A lawyer shall not represent a client if the representation of that client will be directly adverse to the interests of another client, unless: (1) the lawyer reasonably believes the representation will not adversely affect
 
 *936
 
 the lawyer's responsibilities to and relationship with the other client; and (2) each client consents after consultation.
 

 Rule 4-1.7(b) (Duty to Avoid Limitation on Independent Professional Judgment) (2002) provided:
 

 A lawyer shall not represent a client if the lawyer’s exercise of independent professional judgment in the representation of that client may be materially limited by the lawyer’s responsibilities to another client or to a third person or by the lawyer’s own interest, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation.
 

 Rule 4-1.7(c) (Explanation to Clients) (2002) provided: "When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.”
 

 [8]
 

 . Rule 4-1.8(a) (Business Transactions With or Acquiring Interest Adverse to Client) (2002) provided:
 

 A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, except a lien granted by law to secure a lawyer's fee or expenses, unless: (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner that can be reasonably understood by the client; (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and (3) the client consents in writing thereto,
 

 [9]
 

 . Rule 4-1.6(a) (Consent Required to Reveal Information) (2002) provided: "A lawyer shall not reveal information relating to representation of a client except as stated in subdivisions (b), (c), and (d), unless the client consents after disclosure to the client.”
 

 [10]
 

 . Rule 4-1.8(b) (Using Information to Disadvantage of Client) (2002) provided: "A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client consents after consultation, except as permitted or required by rule 4-1.6.”
 

 [11]
 

 .
 
 See Fla. Bar v. Orta,
 
 689 So.2d 270, 273 (Fla.1997) (multiple offenses applied because respondent was found guilty in three separate counts that involved dishonesty, which occurred while he was suspended);
 
 Fla. Bar v. Adler,
 
 589 So.2d 899, 900 (Fla.1991) (multiple offenses applied because the referee found that respondent committed multiple trust fund violations).
 

 [12]
 

 .See Fla. Bar v. Germain,
 
 957 So.2d 613, 622 (Fla.2007) (stating previous discipline for the same kind of misconduct establishes a pattern of misconduct);
 
 Fla. Bar v. Walkden,
 
 950 So.2d 407, 410 (Fla.2007) (stating there is a pattern of misconduct for continuing to engage in acts constituting the practice of law while suspended).
 

 [13]
 

 .
 
 See Fla. Bar v. Barrett,
 
 897 So.2d 1269, 1277 (Fla.2005) (vulnerability of a victim supported where one of the victims retained respondent’s law firm only because she was angry that somebody else had tried to take advantage of her during a time in which she was clearly preoccupied with her son's critical injuries);
 
 Fla. Bar v. Karten,
 
 829 So.2d 883, 890 (Fla.2002) (finding evidentiary support for vulnerability of a victim as an aggravating factor where the respondent, without authorization, took possession of and sold four vehicles belonging to his client while his client was detained in a federal prison located outside of Florida).
 

 [14]
 

 . The referee alternatively offers these findings as other mitigating factors not listed in standard 9.32(k).
 

 [15]
 

 .
 
 See, e.g., Fla. Bar v. De la Torre,
 
 994 So.2d 1032, 1037 (Fla.2008) (recognizing imposition of other penalties or sanctions as a mitigating factor because respondent was subject to specified conditions of probation in a related criminal case);
 
 Fla. Bar
 
 v.
 
 Hagendorf,
 
 921 So.2d 611, 612 (Fla.2006) (recognizing respondent’s suspension for sixty days by the Supreme Court of Nevada, prior to disciplinary proceedings in Florida, as a mitigating factor).
 

 [16]
 

 . Standard 4.34 provides; "Admonishment is appropriate when a lawyer is negligent in determining whether the representation of a client may be materially affected by the lawyer's own interests, or whether the representation will adversely affect another client, and causes little or no injury or potential injury to a client.”
 

 [17]
 

 . There is nothing in the record to support the referee's finding that Johnson was not injured or potentially injured by Ticktin's con-filet because Johnsons' shares in LWL already had been forfeited to the federal government.