The PEOPLE of the State of Colorado, Complainant,

v.

Jeffrey D. LAVENHAR, Attorney–Respondent.

Nos. 95SA261, 96SA106.

Supreme Court of Colorado, En Banc.

March 31, 1997.

Linda Donnelly, Disciplinary Counsel, Kenneth B. Pennywell, Assistant Disciplinary Counsel, Denver, for Complainant.

Waldbaum, Corn, Koff, Berger & Cohen, P.C., Nancy L. Cohen, Denver, for Attorney–Respondent.

PER CURIAM.

We have consolidated two lawyer discipline proceedings involving the respondent for the purpose of issuing one opinion and order. In case No. 95SA261, a hearing panel of the supreme court grievance committee approved the findings and recommendation of a hearing board that the respondent be suspended from the practice of law for one year and one day. The same hearing panel approved the findings and recommendation of a second hearing board in case No. 96SA106 that the respondent be disbarred. We have concluded that disbarment is appropriate.

I.

The respondent was admitted to the practice of law in this state in 1982. The procedural posture of this case is complex. On October 24, 1991, the respondent was voluntarily transferred to disability inactive status. He alleged a disability that impaired his ability to defend himself in pending disciplinary proceedings. See C.R.C.P. 241.19(d). The respondent underwent an independent psychiatric examination by Dr. Irwin Levy. See id. Dr. Levy's report indicated that the respondent did not have a disability that prevented him from either practicing law or defending himself in disciplinary proceedings. Nevertheless, the court granted the respondent's request for a second independent examination. The report of the second examining physician, Dr. William Dahlberg, stated

that by reason of mental and emotional infirmity [the respondent's] ability to defend himself adequately in the underlying

grievance proceeding is impaired, and he is unable to defend himself adequately or meaningfully in the grievance proceeding. The extent of [the respondent's] ability as concerns defense of the grievance proceeding is to cooperate with and assist in a lay capacity a competent attorney, provided that attorney is himself capable of managing and directing [the respondent's] defense of the grievance proceeding.

On April 14, 1992, the court continued the respondent's disability inactive status and placed the disciplinary proceedings in abeyance. On October 29, 1992, we ordered that a hearing be held on the respondent's disability and that Phillip S. Figa, Esq., be appointed to represent the respondent. Figa was appointed under the court's plenary powers over lawyer disciplinary matters, C.R.C.P. 241.15(c) and C.R.C.P. 241.19(d)(4). The court subsequently granted the parties' stipulation to continue the respondent on disability inactive status, but to resume the underlying disciplinary proceedings. Then on June 7, 1994, pursuant to the complainant's request to appoint counsel for the respondent, the court appointed Frank Plaut, Esq. Figa had been permitted to withdraw as the respondent's counsel. Plaut represented the respondent throughout the two disciplinary proceedings before the court now, Nos. 95SA261 and 96SA106, until October 18, 1996, when we appointed the respondent's present counsel to represent him in both proceedings before the court.

## II.

### Case No. 95SA261

This case was heard on April 27 and 28, 1995, before a hearing board. The respondent was represented at the hearing by appointed counsel, although the respondent advised his lawyer that he was "very ill" and did not attend the hearing. Based on the evidence presented, the board made the following findings by clear and convincing evidence.

### A.

On March 3, 1989, Mitchell Clarke retained the respondent's law firm to represent him in an action against Clarke's brother. In 1984, the Clarke brothers were partners in a business called Coat of Arms Painting and Decorating. The brothers executed an agreement in 1987 terminating the business relationship.

Clarke was a member of a legal service plan. The respondent offered reduced fees to members of the plan. Clarke paid the respondent a $500 advance fee and agreed to legal fees of $50 per hour. The respondent filed a complaint in district court in September 1989 asserting contract and tort claims against Clarke's brother. Trial was scheduled to begin on May 15, 1990. As the trial approached, the respondent repeatedly warned Clarke about the outstanding balance in Clarke's legal bill.

The respondent injured his back on the day before trial, and the court granted him a continuance until January 14, 1991. Clarke and the respondent agreed that Clarke would work off part of his legal bill by painting and repairing the respondent's home. In July 1990, while Clarke was painting, the respondent went to a store and charged $107.13 in materials needed for repairs to a general contractor. Clarke's wife was a subcontractor for the general contractor. Neither Clarke nor his wife authorized the respondent to make these charges. The respondent refused to pay Clarke directly for the charges, and issued Clarke a credit for the amount. Clarke's wife notified the store and general contractor of the unauthorized charges and reimbursed the contractor in full with a check.

The respondent filed a motion to withdraw in the district court in August 1990, claiming that Clarke was in default on his fee obligation and that he had accused the respondent of misconduct regarding an outside business relationship. The motion to withdraw was denied. The respondent's motion for reconsideration and petition for an original proceeding in this court were also denied.

The respondent injured his back again on November 3, 1990. Shortly thereafter the respondent reported that he was involved in a serious automobile accident on December 13, 1990. When the district court refused to continue the January 1991 trial, the respondent's paralegal wrote Clarke a letter indi-

cating that the respondent was "physically unable to appear at trial," and providing ideas and suggestions for Clarke to handle the trial pro se. On January 14, 1991, the case was dismissed without prejudice and the respondent and his client were ordered to pay the defendant's attorney fees. The respondent was permitted to withdraw on March 19, 1991. Approximately $6,800 of the over $25,000 billed to Clarke in attorney fees and costs was for "withdrawal-related work and collection-related work commencing in July, 1990."

The respondent's misconduct in the Clarke matter occurred prior to the effective date of the Rules of Professional Conduct, January 1, 1993. By charging repair materials to an account without authorization, the respondent thereby violated DR 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). In addition, the respondent's charging of $6,800 in fees directly related to his protracted efforts to withdraw and to collect his fee violated DR 2–106(A) (charging an illegal or clearly excessive fee).

### B.

As a result of his automobile accident in December 1990, the respondent sustained a brain lesion and suffered from depression. Subsequently, in June 1991, he sustained a concussion following his fall from a roof. On October 24, 1991, the respondent was voluntarily transferred to disability inactive status. *See* C.R.C.P. 241.19. "During such time as a lawyer is on disability inactive status he shall not engage in the practice of law." C.R.C.P. 241.19(a).

Nevertheless, after being transferred to disability inactive status, the respondent used his law firm's letterhead containing his own name in correspondence, in violation of DR 3–101(B) (practicing law in violation of regulations of the legal profession). *See People v. Dieters,* 883 P.2d 1050, 1051 (Colo.1994) (engaging in conduct which included sending letters under attorney letterhead while suspended from the practice of law violated DR 3–101(B)).

In addition, the respondent failed to appear at his own deposition on February 23, 1993, in a pending civil action in which the respondent and his wife were the plaintiffs. He thereby violated R.P.C. 8.4(d) (engaging in conduct that is prejudicial to the administration of justice).

### III.

### Case No. 96SA106

This case was heard by a different hearing board on April 12 and 13, and August 8, 1995. The respondent was represented by counsel and appeared in person on April 12. The respondent did not attend the hearings on April 13 and August 8. Based on the evidence presented, the board made the following findings by clear and convincing evidence.

### A.

In January 1988, Robert R. McKee hired the respondent to recover what he believed he was entitled to from the estate of his aunt and for services he rendered to the estate after her death. The respondent agreed to petition the probate court to open formal probate proceedings and to require the personal representative for the estate to provide an accounting. Nine months later, without any justification or excuse for not filing a timely petition, the respondent filed a motion to enlarge the time within which to institute a proceeding against the personal representative and for an extension of all applicable periods of limitation. The probate court denied the respondent's motion and stated that the court was not authorized to extend the statute of limitations period. The court ordered the respondent's client to pay the attorney fees incurred by the personal representative, and McKee paid them.

The hearing board concluded that the respondent's conduct violated DR 1–102(A)(5) (engaging in conduct prejudicial to the administration of justice); DR 6–101(A)(3) (neglecting a legal matter entrusted to the lawyer); DR 7–101(A)(1) (intentionally failing to seek the lawful objectives of the lawyer's client); DR 7–101(A)(2) (intentionally failing to carry out a contract of employment entered into with a client); and DR 7–101(A)(3)

(intentionally prejudicing or damaging the lawyer's client).

## B.

Sue Ann Shorts retained the respondent in April 1988 to represent her in a pending dissolution of marriage proceeding filed on her behalf by another lawyer. The parties agreed to joint custody of the children, with the implication that the respondent's client would be their residential custodian and with the provision that, if she were to move outside the Denver area, the father would have increased visitation during the children's school vacations.

Shorts advised the respondent's paralegal in August 1988 that she had received a job offer in the state of Washington and she intended to take it. After the decree was signed, Shorts took the children with her to Washington. Shorts testified that she told her ex-husband that she was taking the children to Washington.

On December 5, 1988, Shorts's ex-husband filed a motion for change of custody. The respondent's paralegal informed Shorts, falsely, that contempt proceedings had been filed against her because she had removed the children from the state, that she could be arrested in Washington, and unless she paid the respondent $480 by express mail, he would withdraw from the case. Although there is no evidence that the respondent actually participated in the misrepresentations involving the fictitious contempt proceedings, he failed to comply with his client's repeated requests for copies of the decree and separation agreement and failed to communicate with her at all for an extended period of time. The respondent therefore neglected a legal matter in violation of DR 6–101(A)(3).

## C.

On July 21, 1988, the respondent and his partner, Herman J. Ledbetter, entered into a sublease of office space from Enron Corp. Subsequently, the parties disagreed over who was to bear the expense of certain improvements made to the premises. On December 21, 1988, Enron mistakenly sent the respondent and his partner a check in the amount of $28,333.60, which was intended for a contractor working on the project. Enron was not aware of its mistake.

The respondent did not inquire why he had received the check. Instead, he deposited the check into an interest-bearing account on which he and his partner were authorized to draw. The $28,000 greatly exceeded any possible claim which the respondent or his partner might have against Enron. The respondent used some of the money to purchase appliances, one of which went into his own home, and used some of the funds to pay the partnership's operating expenses.

At this point, Ledbetter brought the matter to Enron's lawyer's attention, who demanded that the money be returned. When it was not, Enron filed an action against the partnership for the return of the funds. Ledbetter entered into a settlement agreement with Enron to repay one-half of the funds that were wrongfully retained. The respondent, on the other hand, continued in protracted litigation and engaged in numerous dilatory tactics. The court finally entered judgment against the respondent on December 17, 1991, in the amount of $15,123.88, which judgment has not been satisfied.

The hearing board found that the respondent retained funds that he knew he was not entitled to, thereby converting them to his own use and benefit. His conduct violated DR 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and DR 1–102(A)(6) (engaging in conduct that adversely reflects on the lawyer's fitness to practice law).

## D.

In the final matter, in December 1987 the respondent ordered copies of depositions taken and transcribed by Thomas Tomko at the respondent's request. The copies were delivered to the respondent in January 1988 along with a bill for $785. When the bill was not paid, Tomko brought an action in November 1988. The respondent finally paid the bill in October 1989 just before the scheduled trial. His conduct violated DR 1–102(A)(5) (engag-

ing in conduct prejudicial to the administration of justice).

## IV.

In case No. 95SA261, the hearing panel approved the hearing board's recommendation that the respondent be suspended for one year and one day, and that, as a condition of reinstatement, the respondent be required to demonstrate by competent psychiatric and medical evidence that his physical and mental condition does not interfere with his ability to practice law. The respondent's exceptions to the panel's action were stricken for failure to file a designation of record and failure to file a transcript of the hearing. *See* C.R.C.P. 241.20(b)(4); *People v. Butler*, 875 P.2d 219, 219 (Colo.1994).

The same hearing panel in case No. 96SA106 approved the second hearing board's findings and recommendation that the respondent be disbarred. The complainant has not excepted to the recommendation of disbarment, but the respondent has.

■ The most serious ethical violation in these proceedings involved the knowing conversion of Enron's $28,000 check. Under the ABA *Standards for Imposing Lawyer Sanctions* (1991 & 1992 Supp.) (ABA *Standards* ), in the absence of mitigating circumstances, disbarment is generally warranted when:

> (a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; ... or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

> (b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

ABA *Standards* 5.11. In addition to the misappropriations in the Enron and Clarke matters, the respondent seriously neglected a number of client matters. "Suspension is generally appropriate when: (a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or (b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client." *Id.* at 4.42.

■ We have repeatedly held that a lawyer's knowing misappropriation of funds, whether belonging to a client or third party, warrants disbarment except in the presence of extraordinary factors of mitigation. *See, e.g., People v. Mundis*, 929 P.2d 1327, 1331 (Colo.1996) (lawyer disbarred for knowing misappropriation of client funds, neglect of client matters, and practicing law under suspension); *People v. Motsenbocker*, 926 P.2d 576, 577 (Colo.1996) (lawyer disbarred for knowingly misappropriating bar association funds); *see also* ABA *Standards* 4.11 (in the absence of mitigating factors, "[d]isbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.").

■ The respondent nevertheless maintains that discipline less than disbarment is appropriate, first, because "[t]he evidence supports the conclusion that [the respondent's] mental disabilities and personal and emotional problems greatly contributed to his misconduct." *See also People v. Lujan*, 890 P.2d 109, 112 (Colo.1995) (lawyer who stole from her law firm was suspended rather than disbarred because of certain extraordinary and tragic factors in mitigation, including the sudden emergence of a mental disorder that caused the misconduct). ABA *Standards* 9.32(i) (Supp.1992) provides:

> (i) mental disability ... [may be considered as a mitigating factor] when:

> (1) there is medical evidence that the respondent is affected by a ... mental disability;

> (2) the ... mental disability caused the misconduct;

> (3) the respondent's recovery from the ... mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and

> (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

In case No. 96SA106, the hearing board concluded:

10.... The evidence is essentially undisputed that during the approximately two (2) year period when these events were occurring Respondent was undergoing considerable emotional problems and stress as a result of the termination of his transactional oil and gas practice, his attempt to establish himself as a high volume general practitioner, and the resulting financial and marital difficulties which ensued. Respondent's personal and emotional problems can be considered mitigating factors.

11. Both Dr. Dahlberg and Dr. Levy diagnosed Respondent as suffering from a longstanding personality disorder. Assuming, without necessarily agreeing, that such a personality disorder can constitute a mental disability within the meaning of Section 9.3[2](i) of the [ABA *Standards*], that condition cannot be considered a mitigating factor in this case. There is no evidence that Respondent has recovered from the disability following "a meaningful and sustained period of successful rehabilitation," or that even if Respondent's condition is somewhat improved, that "recurrence of the misconduct is unlikely." Indeed, the persuasive evidence is that a personality disorder with anti-social aspects is not readily amenable to treatment.

The records supports these findings and we therefore accept them. *See People v. Ogborn*, 887 P.2d 21, 24 (Colo.1994) ("When approved by the panel, the hearing board's factual findings are binding unless, after considering the record as a whole, the findings are not supported by substantial evidence."). The respondent's mental disorder cannot be considered a mitigating factor for our purposes.

The facts of *Lujan* are quite different from this case. 9.32(i). Lujan was involved in a very serious and tragic automobile accident in rural Egypt in which she sustained a closed head injury. *Lujan*, 890 P.2d at 110. Following her return from Egypt, Lujan stole funds from her law firm. *Id.* at 111.

The board found that the respondent's obsessive compulsive disorder caused the misconduct by manifesting itself as an overwhelming compulsion to shop following her experiences in Egypt. The board thought it significant that the type of disorder that the respondent suffers from "is a lifetime affliction of biological origin which cannot be controlled without medication." The misconduct was arrested once the respondent's disorder was properly diagnosed and treated with the correct medication.

*Id.* at 112. Because Lujan's misconduct and her mental disorder both arose after the accident and her medication arrested the misconduct, we concluded that suspension rather than disbarment would adequately protect the public. *Id.* at 112–13. In contrast, the respondent's head injuries which led him to transfer to disability inactive status occurred *after* the most serious misconduct and the misappropriation in this case.

The hearing board in case No. 96SA106 did find that the respondent's personal and emotional problems were a mitigating factor. *Id.* at 9.32(c). In aggravation, the respondent has prior discipline in the form of two letters of admonition, *id.* at 9.22(a); there is the presence of a dishonest or selfish motive, *id.* at 9.22(b); a pattern of misconduct, *id.* at 9.22(c); multiple offenses, *id.* at 9.22(d); the respondent has refused to acknowledge the wrongfulness of his conduct, *id.* at 9.22(g); the respondent has substantial experience in the practice of law, *id.* at 9.22(i); and the respondent has been indifferent to making restitution, *id.* at 9.22(j).[1]

---

1. In his opening brief in case No. 96SA106, the respondent states:

> The Hearing Board found that [the respondent] had indifference to making restitution. The evidence demonstrated that [the respondent] paid $4,000.00 to Enron [Corp.] upon execution of a stipulation by Enron and [the respondent]. Two months later [the respondent] had a third accident that also involved a head injury. Thereafter, [the respondent] transferred to disability practice [sic], and gave up the practice of law. Due to his financial condition he has not made full restitution; under these facts and circumstances, however, it was not a result of indifference.

Even taking these representations at face value, the respondent's stipulation with Enron Corp. and payment of the $4,000 only occurred after Enron had to file an action against him and ultimately obtained a judgment against the re-

Finally, in his reply brief in case No. 96SA106, the respondent asserts that the cases in which disbarment was found to be essentially automatic upon a finding of knowing misappropriation are distinguishable in that they either involve the conversion of client funds or funds the respondent held as a fiduciary. We do not find that difference to be critical given the circumstances of this case and the extent and seriousness of the respondent's other acts of misconduct. *See* ABA *Standards* 5.11. Accordingly, we accept the recommendation of the hearing board and hearing panel in case No. 96SA106 and the findings in 95SA261, and order that the respondent be disbarred.

### V.

It is hereby ordered that Jeffrey D. Lavenhar be disbarred and that his name be stricken from the list of attorneys authorized to practice before this court, effective immediately upon the issuance of this opinion. It is also ordered that, prior to any application for readmission, the respondent pay the combined costs of these proceedings in the amount of $11,888.30 to the Supreme Court Grievance Committee, 600—17th Street, Suite 920–S, Denver, Colorado 80202.

spondent in the amount of $15,123.88. The respondent's actions prior to the entry of judgment justify the conclusion that he was indifferent to

making restitution before transferring to disability inactive status.