WILLIAM R. LUCERO, PRESIDING DISCIPLINARY JUDGE
In 2017, John Palmer Waters ("Respondent") commingled a retainer with his own money and knowingly converted the retainer. He also failed to keep records of funds he held in trust for a representation. Further, he breached client confidences in a motion to withdraw because he was frustrated with his client. Respondent's violations of Colo. RPC 1.6(a), 8.4(c), 1.15A, and 1.15D warrant disbarment.
I. PROCEDURAL HISTORY
On April 6, 2018, Jacob M. Vos, Office of Attorney Regulation Counsel ("the People"), filed a complaint with William R. Lucero, the Presiding Disciplinary Judge ("the PDJ"), alleging that Respondent violated Colo. RPC 1.5(b), 1.6(a), 8.4(c), and 1.15A. Through his counsel, Michael W. Gross, Respondent answered on June 1, 2018, after receiving an extension of time.
The People moved to amend their complaint on August 14, 2018, adding a claim premised on Colo. RPC 1.15D(a). The PDJ allowed the amendment, and Respondent filed an amended answer on September 26, 2018. On October 24, 2018, Gross moved to withdraw from representing Respondent, and the PDJ granted that request two days later.
At the hearing on November 27, 2018, the PDJ, along with lawyers Charles F. Garcia and Marna M. Lake, served on the Hearing Board. Vos represented the People, and Respondent appeared pro se. The Hearing Board heard telephone testimony from Laraine Wright and Cheryl Power[1] as well as in-person testimony from Jason Raines, Janet Layne, and Respondent. The Hearing Board considered stipulated exhibits 1-22 and the parties' stipulated facts.[2]
II. FACT AND RULE VIOLATIONS [3]
Respondent took the oath of admission and was admitted to the practice of law in the Colorado Supreme Court on October 22, 2007, under attorney registration number 39420. He is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in this disciplinary proceeding.[4]
*757 Respondent's Withdrawal from the Raines Case
Jason Raines testified that since 2010 he has litigated an ongoing battle with his ex-girlfriend concerning custody of their daughter. He has mostly represented himself pro se in those proceedings, he said, even though a traumatic brain injury suffered when he was sixteen years old affects his ability to handle high-stress situations.
Raines testified that in May 2017 he was incarcerated in Grand Junction on multiple pending criminal charges. Because he was being held on a $ 25,000.00 cash-only bond, which he could not pay, he remained in jail. Prior to his arrest, Raines said, he had filed a pro se motion to modify his child support. Then, while he was in jail, his ex-girlfriend moved to modify his parenting time, and the court set a hearing on that motion for July 5, 2017. According to Raines, he was not allowed to attend any civil hearings while incarcerated, so he was concerned he would default.[5] He wanted to hire an attorney to attend the hearing and obtain a continuance until he was released from jail; he also wanted assistance with his earlier-filed motion to modify child support. He said that he was given Respondent's name by a friend and that he asked his grandmother, Laraine Wright, to hire Respondent on his behalf. Raines was represented by a public defender in his criminal matters.
Wright testified that she called Respondent in mid-May 2017.[6] She said she relayed general information about Raines's case, but her primary task was to pay Respondent for the representation. On May 17, 2017, she paid Respondent a $ 2,500.00 retainer by credit card.[7]
Raines recalled speaking with Respondent by phone in mid-May 2017. During the call, Raines explained that his case was "easy" and that all Respondent had to do was "show up" at the hearing on July 5, 2017, to "get a continuance." Respondent remembered Raines informing him that the July hearing was merely a status conference. Respondent's billing entries reflect that within several days after speaking with Raines on May 19, 2017, he contacted Raines's public defender and the opposing counsel in the custody matter.[8] Respondent then entered his appearance in Raines's custody case on May 22, 2017.[9]
Raines testified that during Respondent's representation he gave his friend Cheryl Power permission to act as a liaison between him and Respondent because it was difficult for him to communicate with Respondent from jail. Power testified that she primarily supplied Respondent with basic information about the history of Raines's custody case. Raines said that he did not have any conversations with Respondent about waiving attorney-client confidentiality.
By the end of May 2017, Respondent had determined that Raines's case was far more complicated than Raines had described and that Raines had given him inaccurate information.[10] According to Respondent, he waited over a week to "pull" the court file but once he looked into the matter more carefully, he realized that Raines had been untruthful and that his case was not "easy." In fact, he said, Raines's ex-girlfriend had not moved to modify Raines's parenting time but instead had asked the court to restrict parenting time, which, according to Respondent, is the "highest conflicted level of parenting time" that can be requested, requiring a court to analyze twenty-five enumerated factors on the record. Respondent was exasperated with Raines.[11]
Once he realized the purpose of the July hearing, Respondent said, he explained to Wright, Power, and Raines that the best approach would be to address Raines's pending criminal matters first, as they would directly affect the outcome of the motion to restrict. It was then, Respondent said, that Raines became "upset" about the case and *758 insisted that Respondent was not "doing his job."
On June 13, 2017, Respondent told Wright, Power, and Raines that he planned to withdraw from Raines's case.[12] Three days later, Respondent filed a motion to withdraw.[13] The motion included the following statements:[14]
1. Respondent, Jason Raines, hasn't been truthful with undersigned counsel since he hired him.
...
4. Respondent, Jason Raines, has a number of civil and criminal issues pending.
...
6. Because of all these legal issues, it was imperative that, given the extent of the retainer, priorities had to be laid out; rather than attack everyone with impunity. Thereby leaving no money left to actually do some good. Client agreed to this.
7. Mr. Raines said, essentially, this is an "easy" case; nothing could be further from the truth.
...
12. Undersigned counsel was very concerned, though, about the pending felony charge of stalking. That criminal case would vastly impact this case....
13. To undersigned counsel's complete surprise, there were over 303 pleadings filed and over 35 court-appearances. Numerous contempts. A judge recuses herself, etc.
14. Most disturbing was the full-day hearing set for this July 5th, 2017, which Mr. Raines never told undersigned counsel about. Needless to say, undersigned counsel felt lied to, or, at least, "tricked" into taking this case.
15. It got worse. 16. After a number of phone calls to Mr. Raines, his guardian angel, Cheryl Power[ ], and his grandmother, undersigned counsel decided to stick it out and try to keep costs to a minimum, telling him to focus on his felony stalking case and dealing with this case down the road. Client agreed to this.
...
18. After speaking with [Mr. Raines's public defender], though, undersigned counsel learned that Mr. Raines also has a pending DUI and an unwanted sexual contact. Two more misdemeanors that would impact this case. This was the last straw.
19. The attorney/client relationship has completely broken down. 20. It would be an undue burden on counsel to continue on this matter given the lack of trust between undersigned counsel and his client....[15]
Looking back, Respondent said that Raines's case "blew up from day one" because no one listened to him and understood the importance of the case's procedural history. But Respondent admitted that it was unprofessional of him to "vent" about Raines in the motion to withdraw. He acknowledged that many of the statements in his motion were based on information he had learned in conversations with Raines or contained his impressions of the case, although he also noted that some of the information was of public record, such as Raines's pending criminal charges. Respondent recognized that he "went overboard" and disserved the profession by filing the motion. He also admitted that he breached client confidences. He avowed that he now understands how such a motion should properly read.
Raines testified that Respondent never told him about his withdrawal as counsel or that Respondent suspected he was dishonest about his case. Raines said that Respondent's motion did not make sense to him because Respondent had agreed to take his case. Raines maintained that Respondent's motion painted him in a negative light by bringing before the court his criminal matters, which were merely pending, thereby tainting the court's impression of him. Further, Raines said that the unwanted sexual conduct charge had been dismissed three days before Respondent filed his motion. He felt that Respondent's statements were hurtful and surprising.
On June 25, 2017, the court granted Respondent's motion to withdraw.[16] Neither Respondent *759 nor Raines attended the hearing on July 5, 2017.[17] In a minute order issued on July 5, the court granted the motion to restrict Raines's parenting time to supervised visits.[18] Wright testified that because Respondent withdrew shortly before the hearing, she did not have the time or the money to hire another lawyer to represent Raines. Raines testified that he is still fighting for custody of his daughter.
Respondent's Fee Agreement and Trust Account
As noted above, Wright paid Respondent a $ 2,500.00 retainer on May 17, 2017. At that time, Respondent did not give Wright a written fee agreement, but he and Wright both testified that they understood Respondent would bill his time against the retainer at $ 175.00 per hour.[19] That same day, Respondent deposited the $ 2,500.00 into his trust account electronically through his accounting software.[20] Respondent testified that he knew the purpose and importance of keeping client funds in his trust account.
On June 17, 2017, the day after he moved to withdraw in Raines's case, Respondent sent Wright the written fee agreement.[21] The fee agreement reflected Respondent's and Wright's understanding of Respondent's fee structure.[22] The fee agreement also stated that Wright's retainer would be "held in trust ... until earned."[23] Also on June 17, Respondent emailed Wright, stating, "please give me your full name and address again, so that I can send you a refund next month."[24] Wright sent him her address and requested a full accounting.[25]
On June 19, 2017, Respondent prepared an invoice for Wright.[26] The invoice showed that Respondent had earned $ 920.60 in attorney's fees and owed Wright a refund of $ 1,579.40.[27]
Respondent did not immediately send Wright a refund; instead, he consumed a portion of Wright's unearned funds for his personal use on June 26, 2017, as reflected in his bank statements. From June 5 to June 26, 2017, the daily ending balance of Respondent's trust account was $ 3,000.00.[28] On June 26, 2017, Respondent withdrew $ 2,950.00.[29] As a result, his trust account balance dipped to $ 50.00-a sum significantly less than the refund that he owed Wright.[30] Respondent testified that he transferred the $ 2,950.00 on June 26 into his personal checking account to pay bills.[31] The bank statements confirm that the majority of these funds were consumed for his personal expenses.[32]
Respondent testified that on July 7, 2017, he made an electronic deposit of $ 1,200.00 into his trust account, bringing the account's balance to $ 2,159.15.[33] According to Respondent, on that same day he issued Wright a full refund of $ 1,579.40 from his trust account.[34] The People's investigator, Janet *760 Layne, testified that during her investigation she was unable to determine the source of Respondent's deposits into his trust account because he never produced any accounting records. She recalled Respondent telling her that his accounting software "deletes" his client records immediately after he prints an invoice.[35] Respondent said that the $ 1,200.00 he deposited on July 7 "likely" came from another client's funds and thus it was "not [Wright's] money" that he refunded to her.
Respondent admitted that he was "willful" in mishandling his trust account. He also admitted to mismanaging his trust account in the past, keeping it fully funded until an emergency arose, at which point he would transfer funds to his personal account and later move money back into trust. He testified that he has struggled with "entitlement issues" his whole life, but he never intended to steal Wright's money. He has never "stolen a dime" from any other client, he stated, and he was adamant that his trust account has been fully funded since this disciplinary case began.
Respondent's Additional Testimony
Respondent testified that he was raised in a small farming town in Michigan and was close to his father. He said that his family's farm was very profitable until his father "singlehandedly" destroyed that business. Respondent and his family moved in 1986 to Colorado where his father started an advertising firm. Respondent stated that his father recklessly mishandled the firm's client funds while working there. Once caught, Respondent said, his father turned to another business endeavor, offering drug and alcohol classes for wealthy professionals convicted of DUIs who did not want to attend court-ordered classes. According to Respondent, his father's business was designed to "skirt the system"; his father would charge clients for fabricated completion certificates. Respondent testified that he learned "this behavior" growing up and never had any "moral coaching" from his father.
According to Respondent, he recently became a Christian and has changed the way he practices law. He swore that he would never again "borrow" money from his trust account, and if an emergency arose in the future he would get a part-time job to make extra money. He appeared genuinely remorseful for his misconduct and even apologized to Raines while he was on the witness stand. He repeatedly asked the Hearing Board for a second chance.
Colo. RPC 1.5(b)
With their first claim, the People contend that Respondent violated Colo. RPC 1.5(b), which requires a lawyer who has not regularly represented a client to communicate in writing the basis or rate of the lawyer's fee and expenses before or within a reasonable time after commencing the representation. Respondent contravened this rule, say the People, by failing to provide Wright a written fee agreement until after he moved to withdraw from Raines's representation.[36]
It is undisputed that Wright retained Respondent to represent Raines on May 17, 2017, and that on the same day, Respondent and Wright had a phone conversation in which he explained the fee arrangement, including that his hourly rate of $ 175.00 would be billed against the $ 2,500.00 retainer. Wright said she understood the basis of Respondent's fee. Respondent did not, however, give Wright a written fee statement until June 17, 2017-one month after the representation began and eight days before the court granted his motion to withdraw. Although it is not the best practice to wait thirty days to tender a written fee agreement, we do not find that the People have proved by clear and convincing evidence that Respondent violated Colo. RPC 1.5(b), as he tendered a written fee agreement to Wright within thirty days after he was retained, and that agreement accurately reflected the fees they had discussed over the phone one month prior.
*761 Colo. RPC 1.6(a)
Next, the People charge Respondent with contravening Colo. RPC 1.6(a), which precludes, in part, a lawyer from revealing information relating to the representation of a client unless the client gives informed consent. Respondent transgressed this rule, the People argue, by disclosing confidential client information in his motion to withdraw. At the hearing, Respondent admitted that he had disclosed client confidences in the motion, and we agree.
At the time Respondent disclosed information he had learned during the representation and revealed his impressions of the case, Raines had not given Respondent permission to disclose any such information, nor was there any need to do so.[37] While Respondent may have garnered some of this information from another source, the confidentiality rule applies to all matters communicated in confidence by the client and to all information relating to the representation, whatever its source.[38] Accordingly, we conclude that Respondent violated Colo. RPC 1.6(a).[39]
Colo. RPC 1.15A and Colo. RPC 8.4(c)
The People's third and fourth claims allege, respectively, that Respondent violated Colo. RPC 1.15A, which requires a lawyer to hold the property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property, and Colo. RPC 8.4(c), which proscribes conduct involving dishonesty, fraud, deceit, or misrepresentation. Respondent contravened these rules, the People say, by failing to maintain client funds in his trust account and by knowingly and dishonestly converting Wright's funds.
At the hearing, Respondent admitted that he willfully contravened Colo. RPC 1.15A by failing to maintain Wright's unearned funds in his trust account. He did not, however, admit that by transferring Wright's funds into his personal account and using them for personal expenses he knowingly violated Colo. RPC 8.4(c). This is so, he says, because he never intended to keep any of Wright's money, and he replaced those funds.
In order to establish a violation of Colo. RPC 8.4(c), a culpable mental state greater than simple negligence must be proved.[40] A knowing conversion "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking."[41] Misappropriation includes "not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom."[42] Neither the lawyer's motive in taking the money nor the lawyer's intent to return the funds are relevant for disciplinary purposes.[43]
*762 "Knowing and intentional conversion [of client funds] may be established by various types of evidence."[44]
Respondent collected $ 2,500.00 from Wright. From those funds, he earned a legal fee of $ 920.60, so Wright was entitled to a refund of $ 1,579.40. Respondent knew that the $ 1,579.40 did not belong to him and that the money should have remained in trust until refunded to Wright. Instead, Respondent improperly transferred all but $ 50.00 of the funds from his trust account on June 26, 2017, constituting a conversion of the majority of Wright's funds. Respondent did not have Wright's authorization to spend her funds to pay his own bills, yet he used her funds on his personal expenses shortly after the transfer was complete. He then issued Wright a refund twelve days later, using another client's funds to repay her. Accordingly, Respondent exercised possession and control over a portion of Wright's funds from June 26 to July 7, 2017, resulting in her deprivation of those funds, even if only temporarily.[45]
Respondent's defense that he always intended to pay Wright the balance he owed her and that he never intended to permanently deprive her of those funds fails as a matter of law. Respondent's intention to return the funds is irrelevant to the analysis we must perform.[46] Intent to permanently deprive another person of his or her funds is not an element of knowing misappropriation.[47] Respondent took Wright's funds knowing that they were not his, and his use of those funds was not authorized.[48]
We thus conclude the People have proved by clear and convincing evidence that Respondent violated Colo. RPC 1.15A and that he knowingly converted all but $ 50.00 of Wright's funds for his own purposes in violation of Colo. RPC 8.4(c).
Colo. RPC 1.15D(a)
In their final claim, the People contend that Respondent violated Colo. RPC 1.15D(a), which requires a lawyer to maintain for seven years an appropriate recordkeeping system to keep track of funds and other property held for others. The People charge Respondent with violating this rule by failing to maintain financial records documenting his handling of client funds during the period of May to July 2017.
Respondent did not disclose to the People any financial records for the months of May to July 2017. As a result, Layne testified that she could not determine the source of the $ 1,200.00 deposit made on July 7, 2017, into Respondent's trust account. She also said that Respondent told her his accounting software "deletes" all client information after he generates an invoice. We draw from Respondent's inability to produce any accounting records during the relevant timeframe the adverse inference that Respondent did not maintain an appropriate recordkeeping system for each client for whom he was holding funds in his trust account. Accordingly, we find that Respondent failed to maintain appropriate records concerning his clients' funds held in trust, as required under Colo. RPC 1.15D(a).
III. SANCTIONS
The American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards ")[49] and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[50] When imposing a sanction *763 after a finding of lawyer misconduct, a hearing board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that may be adjusted based on aggravating and mitigating factors.
ABA Standard 3.0-Duty, Mental State, and Injury
Duty : Respondent violated his duties of candor and loyalty to Wright when he knowingly converted and neglected to safeguard the funds she entrusted to him for Raines's representation. He also disregarded his duty to Raines to preserve client confidences. As a professional, Respondent acted in dereliction of his responsibility to maintain an appropriate recordkeeping system.
Mental State : The Hearing Board concludes that Respondent acted knowingly when he failed to safeguard funds belonging to Wright, converting those funds, and failed to maintain an appropriate recordkeeping system. That Respondent used Wright's funds to pay his personal expenses and then used another client's funds to repay Wright strongly supports the conclusion that Respondent's conversion was knowing. So does the fact that Respondent admitted to engaging in a pattern of mishandling his trust account. We likewise find that Respondent acted knowingly when he revealed client confidences in his motion to withdraw.
Injury : We conclude that Respondent caused Wright minimal potential injury by temporarily depriving her of the use of her funds for twelve days. Although Wright stated that she did not have the funds to hire another attorney for Raines before the hearing, Respondent's testimony suggests that even if the funds had been available she might not have been able to hire an attorney on such short notice, given the complicated nature of Raines's parental rights hearing. Nevertheless, Respondent's mismanagement of funds and conversion compromised the integrity of the legal profession by tarnishing the public's perception of attorneys and eroding the public's confidence in the legal system.[51]
Additionally, by revealing client confidences without consent, Respondent caused Raines potential injury, since Respondent's disclosures could have tainted the domestic court's impression of Raines's character. We conclude, however, that Respondent's disclosures likely did not cause Raines significant actual harm; the domestic case's procedural history was long, and presumably the presiding judge had already formed an independent judgment about Raines. Further, the court was already aware that Raines was held in custody on pending criminal charges: he asked for a continuance because he was incarcerated and could not post a bond.
ABA Standards 4.0-7.0-Presumptive Sanction
The presumptive sanction applicable to Respondent's most serious misconduct is disbarment, as set forth in ABA Standard 4.11. That standard provides that disbarment is typically warranted when a lawyer knowingly converts client property and thereby causes the client injury or potential injury.[52] ABA Standard 4.22 provides that suspension is generally appropriate when a lawyer knowingly reveals information relating to the representation of a client, where the disclosures *764 were not otherwise lawfully permitted, and causes injury or potential injury to a client.
Where a lawyer has committed multiple types of misconduct, the ABA Standards counsel that the ultimate sanction should at least be consistent with the sanction for the most serious disciplinary violation and generally should be greater than that sanction.[53] Thus, we begin our analysis with disbarment as the presumptive sanction.
ABA Standard 9.0-Aggravating and Mitigating Factors
Aggravating circumstances include any considerations that may justify an increase in the degree of the sanction to be imposed, while mitigating circumstances include any factors that may warrant a reduction in the severity of the sanction.[54] The parties have proposed that we apply a variety of aggravators and mitigators. As explained below, we apply four aggravating factors, one of which we weigh heavily, offset by three mitigating factors, two of which we weigh heavily.
Dishonest or Selfish Motive-9.22(b) : We find that Respondent acted with a dishonest and selfish motive when he knowingly converted and failed to safeguard Wright's funds. He acted selfishly when he consumed Wright's funds without her authorization. Indeed, he consumed these funds for personal expenses almost immediately after determining that he owed her a refund. He then used another client's funds to repay Wright, not knowing exactly to whom those funds belonged. Also during this time, Respondent selfishly disclosed client confidences in his motion to withdraw from Raines's domestic case because he was angry with Raines. Respondent's conversion of Wright's funds coupled with his disclosure of client confidences lead us to assign this aggravator significant weight.
Pattern of Misconduct-9.22(c) : The People asked us during their closing argument to apply this factor in aggravation based on Respondent's acknowledgement at the hearing that he has, in the past, engaged in a pattern of mishandling his trust account. This conduct is troubling, and we choose to weigh this factor in aggravation on these grounds. We also choose to apply this aggravating factor based on Respondent's 2017 private admonition. We consider that case as forming a pattern of misconduct because the misconduct here occurred before issuance of Respondent's private admonition on August 19, 2017.[55] There, Respondent used client confidences to the disadvantage of his client. The Attorney Regulation Committee determined that even though Respondent likely would have learned some of the information from a source other than his client, Respondent's disclosure breached his client's trust and violated Colo. RPC 1.6(a). In both this matter and the 2017 case, Respondent disclosed client confidences. Because this aggravator is based on one instance of similar discipline, we choose to accord average weight to this factor.[56]
Multiple Offenses-9.22(d) : We agree with the People that Respondent engaged in multiple types of misconduct, including conversion, commingling funds, incomplete recordkeeping, and disclosing client confidences. Because he committed four distinct types of misconduct, we choose to apply this factor in aggravation.[57]
Vulnerability of Victim-9.22(g) : The People request application of this aggravating factor because, at the time of Respondent's representation, Raines was in custody with no means of being released on bond, *765 and he needed an attorney to appear on his behalf at the restriction of parental rights hearing. That Raines was in jail during Respondent's representation did not make him particularly susceptible to Respondent's misconduct, including the manner in which Respondent withdrew.[58] We also heard testimony that Raines suffered a traumatic brain injury as a teenager, but we received no evidence that his condition made him more vulnerable to Respondent's misconduct. Accordingly, we decline to apply this factor in aggravation.
Substantial Experience in the Practice of Law-9.22(i) : Respondent has been licensed in Colorado since 2007. At the time of his misconduct, Respondent had been practicing law for ten years. His misconduct reflects poorly on a practitioner with such appreciable experience, and we apply average weight to this factor in aggravation.
Timely Good Faith Effort to Make Restitution or to Rectify Consequences of Misconduct-9.32(d) : Respondent asks the Hearing Board to give him significant credit in mitigation for returning Wright's unearned funds before any disciplinary action was lodged against him. At the hearing, however, Respondent indicated that he used another client's funds to pay Wright-a fact that does not militate in favor of applying this mitigator. Accordingly, we choose not to apply this factor in mitigation.
Full and Free Disclosure to Disciplinary Board or Cooperative Attitude Toward Proceedings-9.32(e) : We choose to apply significant mitigating weight to this factor. While testifying at this disciplinary hearing, Respondent was extremely candid with the Hearing Board. Against his own self-interest, he fully and freely disclosed that he had willfully commingled client funds, mismanaged his trust account, and breached client confidences in this case. He also admitted to using another client's funds to repay Wright and engaging in a pattern of mismanaging his trust account, knowing that these facts could affect the ultimate sanction we impose.
Remorse-9.32(l) : Respondent urges the application of this mitigating factor, asserting that he is indeed remorseful for his misconduct. We agree. During the hearing, Respondent addressed Raines on the witness stand, sincerely apologizing for the disclosures in the motion to withdraw. He also repeatedly apologized to the Hearing Board and to the legal profession for his misconduct in this case, vowing to never again mishandle his trust account. We appreciate Respondent's expressions of remorse and find that he truly realizes the seriousness of his actions. We weigh this factor significantly in mitigation.
Non-Enumerated Factor in Mitigation : The People mention in their hearing brief that Respondent should receive some mitigation in light of the short period of time during which he converted Wright's funds and the relatively small amount of money converted. We find that this factor merits our consideration. As discussed above, given the short duration of the conversion and the amount of funds converted, Wright suffered no actual injury and little potential injury. We thus choose to weigh this factor in mitigation.[59]
Analysis Under ABA Standards and Case Law
The Colorado Supreme Court has directed the Hearing Board to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors.[60] We are *766 mindful that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[61] Though prior cases are helpful by way of analogy, hearing boards must determine the appropriate sanction for a lawyer's misconduct on a case-by-case basis.
As the Colorado Supreme Court has explained, lawyers are "almost invariably disbarred" for knowing misappropriation of client or third-party funds, even when full restitution is tendered.[62] In People v. Finesilver , the Colorado Supreme Court disbarred a lawyer who knowingly converted money paid by clients for "services provided by [a title company] in the course of foreclosures handled by the law firm."[63] There, the Colorado Supreme Court also determined that the lawyer converted funds in violation of the predecessor to Colo. RPC 8.4(c) when he received checks for the benefit of clients but never forwarded those funds to the clients.[64] Despite evidence of several mitigating factors, including personal and emotional problems, payment of restitution, full and free disclosure, character and reputation, and remorse, the Colorado Supreme Court disbarred the lawyer, finding that the evidence of mitigation did not justify a sanction less than disbarment.[65]
Likewise, in People v. Lavenhar , the Colorado Supreme Court determined that disbarment was warranted where the lawyer knowingly misappropriated third-party funds and where no extraordinary mitigation existed.[66] There, the lawyer mistakenly received a check that was intended for a third party, then used the funds for personal and law firm expenses.[67]
The Colorado Supreme Court has deemed disbarment appropriate even where the sum of money converted was not particularly large and the duration of the conversion was limited. For instance, the Colorado Supreme Court disbarred a lawyer in People v. Motsenbocker for knowingly converting $ 2,350.00 of bar association dues over a four-month period, even though the lawyer repaid the funds and established several other factors in mitigation, including remorse and cooperative attitude.[68] Moreover, knowing conversion normally leads to disbarment even when mitigating factors predominate. In People v. Guyerson , the Colorado Supreme Court determined that disbarment was warranted where the lawyer converted a large sum of money from his law firm and clients, despite mitigating factors of absence of prior discipline, substantial personal and emotional problems, cooperation, remorse, and evidence of good character and reputation.[69] Although the attorney was "under tremendous stress, including financial pressure as the sole breadwinner of a family which grew in a fashion he did not anticipate, and a host of serious and costly medical procedures," the Colorado Supreme Court affirmed the hearing panel's recommendation of disbarment, considering the extent of the lawyer's intentional conversion and, in particular, the lawyer's failure to remedy his misconduct until after it was discovered by the law firm.[70]
*767 In exceptional circumstances, however, even cases involving knowing conversion have resulted in a sanction less than disbarment. For example, in People v. Lujan , the Colorado Supreme Court approved a suspension rather than disbarment for conversion because the respondent presented substantial evidence of mental disability and proved that the mental disability actually caused the misconduct.[71] Other mitigating factors were also present, including good character and reputation as well as interim rehabilitation.[72] Likewise, in In re Fischer , a lawyer knowingly misappropriated third-party funds but he did not treat the funds as his own and presented significant mitigation, including character, remorse, and lack of an attempt to falsify, deceive, or conceal his misconduct, overcoming the presumption of disbarment.[73]
Here, however, Respondent did not present evidence of mitigation substantial enough to warrant a departure from the presumptive sanction. Respondent's remorse and full and free disclosure are certainly significant: we applaud his decision to proceed with candor and transparency. We also carefully consider the fact that Respondent's conversion took place during a relatively short period of time, twelve days, involved a sum much smaller than that typically at issue in disbarment cases, and caused very little potential injury to Wright. Indeed, Respondent's mishandling of funds has a somewhat different character from many other instances of conversion addressed in Colorado case law, and we take this consideration to heart in our deliberations. Nevertheless, we conclude that the mitigating factors here are not so extraordinary as to warrant a lesser sanction than disbarment, particularly when weighed against the factors applied in aggravation-Respondent's dishonest and selfish motive, multiple offenses, pattern of misconduct, and substantial experience in the practice of law.[74] As noted above, we also disagree with Respondent that his restitution of Wright's funds should be considered a significant mitigating factor. We treat Respondent's misconduct seriously not only because it undermines the trust between clients and their lawyers, but also because it severely damages the public's confidence in the legal profession and the perception of attorneys.[75]
IV. CONCLUSION
By commingling a retainer with his own funds, converting the retainer, failing to follow recordkeeping requirements, and disclosing client confidences, Respondent ignored his duties under the Rules of Professional Conduct. We find that disbarment is the appropriate sanction for his serious misconduct.
V. ORDER
The Hearing Board therefore ORDERS :
1. JOHN PALMER WATERS , attorney registration number 39420, SHALL BE DISBARRED. The suspension will take effect upon issuance of an "Order and Notice of Disbarment."[76]
*768 2. To the extent applicable, Respondent SHALL promptly comply with C.R.C.P. 251.28(a)-(c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.
3. Within fourteen days of issuance of the "Order and Notice of Disbarment," Respondent SHALL comply with C.R.C.P. 251.28(d), requiring an attorney to file an affidavit with the PDJ setting forth pending matters and attesting, inter alia, to notification of clients and other jurisdictions where the attorney is licensed.
4. The parties MUST file any posthearing motion or application for stay pending appeal with the Hearing Board on or before Tuesday, February 12, 2019 . Any response thereto MUST be filed within seven days.
5. Respondent SHALL pay the costs of these proceedings. The People SHALL submit a statement of costs on or before Tuesday, February 5, 2019 . Any response thereto MUST be filed within seven days.
CHARLES F. GARCIA
HEARING BOARD MEMBER
MARNA M. LAKE
HEARING BOARD MEMBER

On October 31, 2018, the PDJ granted the People's request to present these witnesses' testimony by telephone.

On November 13, 2018, the People filed a proposed statement of stipulated facts. At the hearing, Respondent agreed to stipulate to those facts.

Where not otherwise indicated, these facts are drawn from testimony provided at the hearing.

See C.R.C.P. 251.1(b).

Raines testified that he moved pro se to continue the hearing or to be transferred from jail to attend the hearing, but the court denied both requests.

See also Stip. Facts ¶ 2.

Stip. Facts ¶ 7.

Stip. Facts ¶¶ 10-11; Ex. 10 at 00122.

See Ex. 20 at 00034.

Stip. Facts ¶¶ 12-13; see Ex. 10 at 00122-23.

Stip. Facts ¶ 14; see Ex. 10 at 00122-23.

Stip. Facts ¶ 15; Ex. 3.

Stip. Facts ¶ 16; Ex. 4.

We reproduce this filing here with all original grammatical and typographical errors.

Ex. 4 at 00111-12.

Stip. Facts ¶ 23; Ex. 20 at 00033.

See Ex. 20 at 00032.

See Ex. 20 at 00032.

Stip. Facts ¶ 8.

See Stip. Facts ¶ 9; Ex. 11 at 00158 (reflecting the $ 2,500.00 deposit from QuickBooks). The People's investigator, Janet Layne, confirmed that this $ 2,500.00 deposit was Wright's retainer.

Stip. Facts ¶ 17; Exs. 8-9; see also Ex. 10 at 00123.

Stip. Facts ¶ 20.

Ex. 9 at 00118.

Stip. Facts ¶ 18; Ex. 8.

Stip. Facts ¶ 19; Ex. 8.

Ex. 10.

Stip. Facts ¶ 21; Ex. 10. The People do not dispute that Respondent earned this fee.

Ex. 12 at 00161.

Ex. 12 at 00160.

Ex. 12 at 00161.

See Ex. 15. Respondent testified that he did not have a business operating account.

See Ex. 15 at 2 of 4.

See Ex. 13 at 1 of 4. As reflected on Respondent's trust account statements, he made several other deposits and withdrawals from June 30 to July 7, 2017, all of which contributed to the daily ending balance on July 7 of $ 2,159.15. See Exs. 12-13.

Ex. 13; Ex. 16; Stip. Facts ¶ 22.

See also Ex. 18.

The People's complaint alleged that Respondent did not give Wright or Raines a written statement of his fee until the representation was over. At the hearing, the People did not advance any argument concerning Respondent's failure to give Raines a written fee agreement within a reasonable time, perhaps because Wright was responsible for the fee. Accordingly, we base our findings solely on whether Respondent tendered to Wright a written fee agreement within a reasonable time.

See Colo. RPC 1.6(b) (setting forth situations that may justify disclosures of information relating to a representation).

See Colo. RPC 1.6 cmt. 3; see, e.g., Iowa Supreme Court Att'y Disciplinary Bd. v. Marzen , 779 N.W.2d 757, 766 (Iowa 2010) (finding that all lawyer-client communications, even those including publicly available information, are confidential).

See Lawyer Disciplinary Bd. v. Farber , 200 W.Va. 185, 488 S.E.2d 460, 465 (1997) (finding that a lawyer's motion to withdraw and an attached affidavit went beyond the type of information appropriate to the termination of an attorney-client relationship); In re Gonzalez , 773 A.2d 1026, 1032 (D.C. 2001) (imposing sanctions on a lawyer who, when withdrawing from a representation, submitted confidential information related to the representation in a public filing, and did not appropriately redact the material most potentially damaging to his clients).

In re Fisher , 202 P.3d 1186, 1203 (Colo. 2009) ; see People v. Varallo , 913 P.2d 1, 11 (Colo. 1996) ("[D]epositing client funds into a trust account with a negative balance, if done only negligently, would be a technical rather than knowing conversion of client funds. On the other hand, using client funds for personal use without the client's permission by writing a check on a trust account that the lawyer knows contains only client funds would be a knowing conversion of client funds, whether or not the lawyer intended to eventually replace the funds.").

Varallo , 913 P.2d at 11 (quoting In re Noonan , 102 N.J. 157, 506 A.2d 722, 723 (1986) ).

Id . (quoting In re Wilson , 81 N.J. 451, 409 A.2d 1153 n.1 (1979) ).

Id . at 10-11.

People v. Robnett , 859 P.2d 872, 877 (Colo. 1993).

See People v. Dickinson , 903 P.2d 1132, 1136 (Colo. 1995) (concluding that an attorney who deposited client funds into an operating account, wrote checks from that account, and reimbursed the client with other funds violated the precursor to Colo. RPC 8.4(c) ).

Varallo , 913 P.2d at 10-11.

Id. at 11 (citing In re Barlow , 140 N.J. 191, 657 A.2d 1197, 1201 (1995) ).

See In re Kleinsmith , 2017 CO 101, ¶ 13, 409 P.3d 305, reh'g denied (Nov. 20, 2017), reh'g denied (Dec. 18, 2017), cert. denied sub nom . Kleinsmith v. Colorado , --- U.S. ----, 138 S.Ct. 1559, 200 L.Ed.2d 744 (2018) ("An attorney's knowing conversion of funds belonging to a client or a third person violates Colo. RPC 8.4(c).").

Found in ABA Annotated Standards for Imposing Lawyer Sanctions (2015).

See In re Roose, 69 P.3d 43, 46-47 (Colo. 2003).

People v. Radosevich , 783 P.2d 841, 842 (Colo. 1989) (noting that conversion "severely damages the public's perception of attorneys, and erodes public confidence in our legal system"); People v. McMahill , 782 P.2d 336, 338 (Colo. 1989) (noting that conversion "severely damages the public's perception of attorneys and its confidence in our legal system").

See In re Cleland, 2 P.3d 700, 703 (Colo. 2000) ("Neither this standard nor [Colorado Supreme Court] cases require serious injury before disbarment is appropriate"). We adopt the People's request to apply ABA Standard 4.11, rather than ABA Standard 5.11(b), which states that disbarment is generally warranted when a lawyer engages in intentional but non-criminal conduct involving dishonesty that seriously adversely reflects on his or her fitness to practice law. Even though Standard 4.11 discusses conversion of funds belonging to clients, rather than third parties, we find this standard most apt under the facts of this case because the funds that Respondent converted from Wright were entrusted to him by Wright to pay for Raines's representation. See People v. Motsenbocker, 926 P.2d 576, 577 (Colo. 1996) (applying ABA Standard 4.11 to misappropriation of third-party funds). Under application of either standard, however, the result in this case would be the same.

ABA Standards § 2 at 7.

See ABA Standards 9.21 & 9.31.

See People v. Williams , 845 P.2d 1150, 1153 n.3 (Colo. 1993) (finding that an earlier suspension should be considered as a pattern of misconduct rather than as prior discipline where most of the misconduct in the then-pending case took place before the imposition of the earlier suspension).

See In re Olsen , 2014 CO 42, ¶ 32, 326 P.3d 1004 (applying only average weight to the aggravating factor of pattern of misconduct when it was based on only one instance of similar discipline).

See id. at ¶ 31 (concluding that the hearing board applied too much weight to the aggravating factor of multiple offenses because the attorney's rule violations were "more appropriately characterized as a single violation arising from the ongoing pattern of untruths of his client, rather than three distinct violations").

See Fla. Bar v. Ticktin , 14 So.3d 928, 938 (Fla. 2009) (stating that "[v]ulnerability of a victim is established when findings support that a respondent exercised undue advantage over a client who was not reasonably in a position to protect himself or herself" and noting that the fact that a client was incarcerated did not require a finding of vulnerability of the victim); In re Kagele, 149 Wash.2d 793, 72 P.3d 1067, 1079 (2003) ("People hire attorneys because they are in situations serious enough to require legal expertise and advice. A client's need for an attorney does not render him or her vulnerable....").

"While the ABA Standards enumerate a number of ... aggravating and mitigating factors, they are expressly intended as exemplary and are not to be applied mechanically in every case." In re Rosen , 198 P.3d 116, 121 (Colo. 2008) ; see also In re Kamb , 177 Wash.2d 851, 305 P.3d 1091, 1099 (2013) (noting that the list of aggravators in the ABA Standards is nonexclusive).

See In re Attorney F. , 2012 CO 57, ¶ 15, 285 P.3d 322 ; In re Fischer , 89 P.3d 817, 822 (Colo. 2004) (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

In re Attorney F. , ¶ 20 (quoting In re Rosen , 198 P.3d 116, 121 (Colo. 2008) ).

Varallo , 913 P.2d at 11 ; see also In re Thompson , 991 P.2d 820, 823 (Colo. 1999) (disbarring an attorney who knowingly converted client funds despite a clean disciplinary record, the presence of personal and emotional problems, and payment of restitution); People v. Lavenhar , 934 P.2d 1355, 1358-59 (Colo. 1997) (noting that a lawyer's misappropriation of funds belonging to a third party violated the predecessor to Colo. RPC 8.4(c) and stating that such conduct warrants disbarment, absent extraordinary mitigating factors); People v. Lefly , 902 P.2d 361, 364 (Colo. 1995) (disbarring an attorney for knowingly converting client funds despite mitigating factors, including payment of full restitution to his clients after the request for investigation was filed).

826 P.2d 1256, 1256-57 (Colo. 1992).

Id . at 1257.

Id . at 1259.

934 P.2d at 1359.

Id . at 1358.

926 P.2d at 577.

898 P.2d 1062, 1063-64 (Colo. 1995).

Id . at 1064.

890 P.2d 109, 112-13 (Colo. 1995).

Id .

89 P.3d at 822.

See Lavenhar , 934 P.2d at 1360-61 (disbarring a lawyer for knowing misappropriation of client funds, even though he had considerable personal and emotional problems and a debilitating head injury ); Young , 864 P.2d at 564 (disbarring a lawyer for knowing conversion of clients' funds, notwithstanding the presence of restitution, the lawyer's cooperation, and the absence of prior discipline); Lefly , 902 P.2d at 365 (disbarring a lawyer despite the presence of severe personal and emotional problems); Guyerson , 898 P.2d at 1063 (disbarring a lawyer who converted law firm and client funds notwithstanding the presence of substantial personal and emotional problems and the absence of prior discipline); People v. Ogborn , 887 P.2d 21, 23 (Colo. 1994) (disbarring a lawyer for conversion of client funds even considering the absence of prior discipline and the presence of personal and emotional problems).

See In re Wilson , 409 A.2d at 1157-58 ("[M]aintenance of public confidence ... and in the bar as a whole requires the strictest discipline in misappropriation cases. That confidence is so important that mitigating factors will rarely override the requirement of disbarment. If public confidence is destroyed, the bench and bar will be crippled institutions.").

In general, an order and notice of sanction will issue thirty-five days after a decision is entered under C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.